WILLIAM B. BEND *vs.* JESSE HOYT.

The plaintiff, as the importer of certain merchandise from England, entered the same at the customhouse in New York, on the 29th of March, 1837, as cases containing cotton gloves. He gave a bond for the duties, payable on the 27th of June, 1838. In 1838, it was discovered that one of the cases, No. 45, contained silk hose, and not cotton gloves. The plaintiff paid the bond to the collector, under protest; and claimed from the comptroller of the treasury, to be released from the payment of the duties on case No. 45, alleging, that as silk hose, they were not liable to duty under the act of Congress of 14th July, 1832. The plaintiff instituted a suit against the collector, to recover back the duties so paid by him. Held, that the suit could not be sustained, after so long a time from the entry of the merchandise. Held, that silk hose, and all manufactures of silk, of which silk is the component material of chief value, coming from this side of the Cape of Good Hope, except sewing silk, are free of duty.

Even Courts of Equity will not interfere to assist a party to obtain redress for an injury which he might, by ordinary diligence, have avoided. And, a fortiori, a Court of law ought not, when the other party has by his very acts and omissions lost his own proper rights and advantages.

A collector is generally liable in an action to recover back an excess of duties paid to him as collector, when the duties have been illegally demanded, and a protest of the illegality has been made at the time of payment, or notice given that the party means to contest the claim. Nor is there any doubt that a like action generally lies, where the excess of duties has been paid under a mistake of fact, and notice thereof has been given to the collector before he has paid over the money to the government.

ON a certificate of division of opinion from Circuit Court of the United States, for the southern district of New York.

This suit was originally instituted in the Superior Court of New York, and was afterwards brought before the Circuit Court of the southern district of New York, by a certiorari. An action of assumpsit was instituted against the collector of the port of New York, to recover the sum of one hundred and twenty-seven dollars, paid to him by the plaintiff, for the importation of silk hose. The duty was levied at the rate of twenty-five per centum ad valorem, " as hosiery," under the second article of the second section of the act of Congress of 14th July, 1832, entitled " an act to alter and amend the several acts imposing duties on imports."

Upon the trial it was proved, that on the 29th of March, 1837, the plaintiff made an entry at the customhouse in New York, of eight cases of cotton gloves, and that the duty was levied on each of the eight packages of twenty-five per centum ad valorem; for which duty, with the duties on other goods, the plaintiff gave a bond for two hundred and ninety-four dollars, payable on the 27th June, 1838.

The plaintiff on making the entry, made the usual affidavit to the truth of the invoice and bill of lading produced by him, and that the invoice produced by him was the true invoice of the cost of the goods, and that if any error was discerned in the invoice or cost of the goods, he would immediately make the same known to the collector.

It was proved, that in the year 1838, it was discovered that case

**[William B. Bend vs. Jesse Hoyt.]**

No. 45, one of the packages in the invoice, did not contain cotton gloves, but actually contained silk hose, and that one hundred and twenty-seven dollars and ninety-two cents, were bonded by the plaintiff, under the belief that the case contained cotton gloves. On the 28th June, 1838, the plaintiff served a protest on the collector, against the payment of the bond given to secure the duties. The protest stated, that the bond had been given under a clear misapprehension of the nature of the goods, and claimed a deduction from the bond of the amount of the estimated duties on box No. 45, supposing the box to contain cotton gloves.

The plaintiff had previously requested the comptroller of the treasury to release him from the payment of the duties; and the comptroller in reply, refused to correct " errors in fact."

On the trial of the cause, the collector introduced and read to the jury, to show the habitually loose manner in which the plaintiff transacted his business, an affidavit made by the plaintiff on the 25th of April, 1838.

The affidavit stated, " that on the 27th day of March, 1837, he imported in the ship Roscoe, from Liverpool, eight cases and casks of hosiery and gloves, marked B 38 to 45, owned by Barker and Adams, manufacturers of Nottingham, England, and consigned by them to him, the said William B. Bend, for sale; that his clerk not being able to ascertain from the wording of the invoice, which packages contained gloves, and which hosiery, and knowing that cotton gloves and cotton hosiery paid the same duty, he entered them all upon arrival at the customhouse, in the port of New York, as cotton gloves; that a duty of twenty-five per centum was charged upon them by the collector of the said port, and that he, the said Bend, gave bonds to the said collector, to pay the said duties; that on examination of the goods contained in one of the aforesaid cases, marked B 45, he found them to be spun silk hoisery, and not cotton gloves, as entered by him at the customhouse; and furthermore, that the goods are called, upon the original invoice, passed at the customhouse, " spun knots;" a term which is well known in the trade to be applied to hosiery of silk only: and that he verily believes the error of entering the said case, and paying duty, arose from the ignorance of his clerk who made the entry; that he, the said Bend, did not upon this, nor does he upon any occasion, examine whether the customhouse entries, made by the said clerk, are correct. And the said William B. Bend, further maketh oath, that he has never sold any part of the said case, B 45, and that, to the best of his knowledge and belief, nothing has been ever taken from or added to it, but that it is in every respect in the same condition as it was when he received it."

It was also proved, that the package No. 45, was never in the custody of the collector, nor subjected to the examination of the public appraisers; and that the first intimation the collector had that it contained silk, was in March or April, 1838.

It was also proved, that the merchandise contained in the pack-

[William B. Bend *vs.* Jesse Hoyt.]

age No. 45, was silk hose, made of the tow of silk, a coarse quality of silk, but still silk, sometimes called sponged silk; and that the said merchandise was well known, in commerce, under the denomination of hosiery.

Upon the foregoing evidence, given during the progress of the trial, the following points were presented on the part of the defendant, for the opinion of the judges, on each of which the judges were divided in opinion.

1. Whether, assuming that an excess of duties was paid by mistake, under the facts above stated to the collector, on the before mentioned package, No. 45, the plaintiff, under the said facts, is entitled to recover back such excess, in a personal action against the collector?

2. Whether the said silk hose was subject to the payment of the duty imposed on "hoisery" by the second clause of the second section of the act of July 14th, 1832, entitled "an act to alter and amend the several acts imposing duties on imports;" or whether, as manufactures of silk, not being sewing silk, the goods, wares, and merchandise, contained in said package, No. 45, were exempted from the payment of duty by the fourth section of the act of March 2d, 1833, entitled "an act to modify the act of the fourteenth of July, one thousand eight hundred and thirty-two, and all other acts imposing duties on imports;" which declares that all manufactures of silk, or of which silk is the component material of chief value, coming from this side of the Cape of Good Hope, except sewing silk, shall be free?

Which said points, upon which the disagreement happened, are stated under the direction of the judges of the said Court, at the request of the counsel for the parties in the cause, and ordered to be certified unto the Supreme Court of the United States, at the next session.

The case was argued by Mr. Raymond and Coxe, for the plaintiff; and by Mr. Grundy, the Attorney General of the United States, for the defendant.

Mr. Justice STORY delivered the opinion of the Court.—

This case comes before us upon a certificate of division of opinion of the judges of the Circuit Court of the southern district of New York. The original suit was assumpsit to recover back from the defendant, who is the collector of the port and district of New York, a sum of money paid as duties upon certain imported goods, upon the ground that they were not liable to duty. Upon the trial it appeared, that on the 29th of March, 1837, an entry was made by the plaintiff, as consignee, at the customhouse of New York, of eight cases of cotton gloves, marked B, numbered from 38 to 45, as imported from Liverpool, England. The case, number 43, was designated on the invoice to be examined, and was passed as correct; whereupon the duty was levied upon each of the eight pack-

ages at 25 per centum ad valorem, as being cotton gloves; which
duty was secured by a bond, which became due on the 27th of
June, 1838. Upon making the entry, the invoice of the goods was
produced, and the common oath on such occasions taken and sub-
scribed in the form prescribed by law. It was proved, that in the
year 1838, it was discovered by the plaintiff, that the case numbered
45 did not contain cotton gloves, but actually contained silk hose;
and that the plaintiff had paid $127.92 for duties, under the belief
that the package contained cotton gloves. On the 25th of April,
1838, the plaintiff addressed a letter to the comptroller of the trea-
sury, requesting to be released from the payment of the duty; to
which the comptroller replied on the 27th of the same month, re-
fusing to do so, upon the ground that whether the goods were com-
posed of silk or of cotton was clearly a matter of fact, and should
have been settled before the removal of the goods from the custom-
house; and that he did not feel authorized to make the plaintiff's
case an exception to the uniform and long established rule of the
department, by permitting a revision of the entry. On the 26th of
June, 1838, the plaintiff addressed a letter to the defendant, inform-
ing him that no duties were payable on the goods; and that in pay-
ing the amount he should do it under protest, reserving his legal
rights. It was further proved, that the package number 45 never
was in the custody of the collector, nor subjected to the examination
of the public appraisers.; and that the first intimation that the col-
lector had, that it contained silk hose, was in March or April, 1838.
The merchandise contained in the package number 45 was silk hose
made of the tow of silk, a coarse quality of silk, but still silk, some-
times called sponged silk; and was well known in commerce under the
denomination of hosiery. An affidavit of the plaintiff was read in
evidence by the defendant, to show the habitually loose manner
in which the plaintiff transacted his business with the customhouse;
and in which, among other things, the plaintiff attributed the error
in the entry at the customhouse to the ignorance of his own clerk in
making the entry, and not being able to understand, from the wording
of the invoice, which packages contained gloves, and which hosiery.

Upon this evidence the following points were presented by the
defendant for the opinion of the judges, on each of which the judges
were divided in opinion. 1. Whether, assuming that an excess of
duties was paid by mistake, under the facts above stated, to the
collector, on the before mentioned package number 45, the plaintiff,
under the said facts, is entitled to recover back such excess in a per-
sonal action against the collector. 2. Whether the said silk hose
was subject to the payment of duty imposed on hosiery by the
second clause of the second section of the act of the 14th of July,
1832, ch. 224, entitled, "An act to alter and amend the several acts
imposing duties on imports;" or whether, as manufactures of silk,
not being sewing silk, the same were exempted from the payment
of duty by the fourth section of the act of the 2d of March, 1833,
entitled, &c., ch. 354, which declares that all manufactures of silk, or ·

of which silk is the component material of chief value, coming from this side of the Cape of Good Hope, except sewing silk, shall be free.

As to the first question, there is no doubt that the collector is generally liable in an action to recover back an excess of duties paid to him as collector, where the duties have been illegally demanded, and a protest of the illegality has been made at the time of the payment, or notice then given that the party means to contest the claim; whether he has paid over the money to the government or not. Nor is there any doubt that a like action generally lies where the excess of duties has been paid under a mistake of fact, and notice thereof has been given to the collector before he has paid over the money to the government. Both of these propositions are fully discussed and decided in the case of Elliot vs. Swartwout, 10 Peters' R. 137; and if the present point involved nothing more, there would be no substantial ground of controversy. But there are other ingredients in the present case.

The goods were actually entered by the plaintiff at the custom-house, by a particular description—that of cotton goods; and he then swore that the invoice then produced by him was the true invoice received by him, and that the entry contained a just and true account of the same goods; and upon the faith of that entry and oath, the goods were actually delivered to him by the collector without any examination whatsoever. No notice was given to the collector of any mistake until nine or ten months afterwards, when the government was no longer in a condition to ascertain the real state of the facts; and when, of course, it was compelled to rely exclusively upon the evidence furnished by the plaintiff. Now, certainly, it was the duty of the plaintiff, before making the entry at the customhouse, to have exercised due diligence in examining his papers, and ascertaining the true state of the facts, before he undertook to verify them under the solemnity of an oath. That he was grossly negligent in this particular is plain from his own showing; and that the loss, if any has accrued to him, has accrued from his negligence and inattention to his duty, is equally clear. The question then arises, whether this action is maintainable, not under ordinary circumstances of innocent mistake, but under circumstances of culpable negligence on the part of the plaintiff, and when the government can no longer be replaced in the same situation in which it stood at the time of the original transaction. Upon the best consideration which we can give to the subject, we are of opinion, that the action, under such circumstances, is not maintainable. If a different rule were to prevail, the whole policy of the laws for the collection of duties would be broken in upon; there would be no certainty whatsoever as to the amount or receipt of the revenue; and the grossest evasions and frauds might be practised with perfect impunity. Instead of the invoice or entry, with the accompanying oath of the party, furnishing the just means of ascertaining the nature, and quality, and character of the goods imported, and the amount of duties payable thereon; every thing would be

left loose, and open, in case of contest, to the uncertain evidence to be produced before successive juries. The whole system of guards introduced into the revenue laws, for the purpose of ascertaining the nature, quality, description, and value of imported goods, would in a short time, amount to little more than forms, as vexatious as they would be inefficacious. The act of 1823, ch. 149, in amendment of the former acts for the collection of duties, manifestly lays great stress on the invoice, produced at the time of the entry of the goods at the customhouse, and the accompanying oath of the importer; as the truest and best means of ascertaining the nature, and quality, and values of the goods, and the basis of the duties to be charged thereon; as is apparent from the series of sections from the fourth to the fifteenth sections. Invoices duly verified and authenticated, are deemed a sufficient title to entry; while others, not so verified and authenticated, are declared to be deemed to be suspected, and liable to be treated in the same manner as fraudulent invoices. And the 23d section of the act provides, that when goods are admitted to an entry upon invoice, the collector shall certify the same under his official seal; and no other evidence of the value of such goods shall be admitted on the part of the owner in any Court of the United States, except in corroboration of such entry. It seems difficult to resist the conclusion, that though the language of this section is confined in its terms to the invoice value of the goods, because the duties were to be calculated ad valorem thereby, yet that, consistently with its professed objects, it ought to be deemed equally conclusive as evidence of the nature, quality, and description of the goods. At all events, it would seem to be against the whole policy of the act, as well as of the other acts of Congress respecting the collection of the revenue, to permit a man to enter packages of goods by one description, under his solemn oath, and thus to withdraw them from the custody of the collector, without any examination of the contents of the packages; and, afterwards to insist upon another description totally different, and thereby to change the rate of duties, or to claim an exemption from all duties. The public inconveniences attendant upon such a practice, would alone be sufficient to repel any presumption that Congress intended to authorize it, unless there were some explicit provision in favour of it; and the uniform course of the government to disallow it, furnishes strong evidence that the true construction of the act does not justify the practice. The consignee had his choice at the time of the entry, either to rely on his invoice, or to have the contents of each package examined. He chose the former; and the latter is, on the part of the government, no longer practicable—at least not so far as to be satisfactory or certain in its results. The error, if any there has been, has arisen, as we have already stated, from his own culpable negligence; and Courts of justice do not sit for the purpose of aiding those who seek redress for supposed mischiefs resulting from such negligence. Even Courts of equity will not interfere to assist a party to obtain redress for an injury which he might by ordinary

[William B. Bend vs. Jesse Hoyt.]

diligence have avoided; and, a fortiori, a Court of law ought not;. where the other party has, by the very acts or omissions, lost his. own proper rights or advantages.

No case has been cited, and none has come to our knowledge,. where an action has been maintained at law, under circumstances: like the present; where money has been sought to be recovered for a mistake of fact occasioned by the culpable negligence of the plain-. tiff, and where the retaining of it on the other side is not unconscientious. The case here cannot be better than it would have been, if the plaintiff had refused to pay the duty bond; and, to an action. on the bond, he had pleaded in his defence the very matters now insisted on. It would certainly have been difficult to have framed. a plea to sustain such a defence in point of law. If the objection were to be insisted on, that would seem to have been as proper a. mode of meeting it as could have been devised; though, looking to the penal consequences of not paying a duty bond, as it withdraws from the party all future credit at the customhouse while it continues, we do not say that the present mode may not also be appropriate. Lord Mansfield, in Moses vs. Macfarlan, 2 Burr. R. 1005. 1012,. speaking of an action for money had and received, observed that it lies for money paid by mistake, or upon a consideration which hap-. pens to fail, or for money got through imposition, (express or im-. plied,) or extortion, or oppression, or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under such circumstances. And he added, in one word, the gist of the action is, that the defendant, under the circumstances of the case, is obliged, by the ties of natural justice and equity, to re-. fund the money. In Bize vs. Dickason, 1 Term Rep. 285, he also. said: The rule has always been, that if a man has actually paid. what the law would not have compelled him to pay, but what in equity and conscience he ought, he cannot recover it back again: But where money is paid under a mistake, which there was no. ground to claim in conscience, the party may recover it back again by this kind of action. Now, admitting the entire correctness of this doctrine in its full extent, (and no more than general truth can. be imputed to it,) it leaves the whole matter open upon which the present controversy turns; and that is, whether there is any want of conscience in the collector's retaining this money. And it leaves: wholly untouched the ground, what would be the effect if the mis-. take and the payment consequent thereon, had been the consequence of the culpable negligence or misconduct of the plaintiff himself,. without any default on the other side, and where thereby he could not be placed in statu quo. Our opinion is, that, upon principle, under such circumstances, no such action is or ought to be maintainable. In Milnes vs. Duncan, 6 Barn. and Cresw. 671, the party was allowed: to recover back money paid under a mistake of fact, there being no. laches imputable to him; and that was the very ground of the deci-. sion. In that case, Mr. Justice Bayley said: If a party pay money under a mistake of the law, he cannot recover it back. But if he

z 2

pay money under a mistake of the real facts, and no laches are imputable to him, in respect of his omission to avail himself of the means of knowledge within his power, he may recover back the money; and he added, in this case, the question is, whether there was, on the part of the plaintiff, at the time when he made the payment, ignorance of the true state of the facts, or any negligence imputable to him in not availing himself of the means of knowledge within his power. So that we here see it admitted that negligence would constitute a good defence to the suit. In Skyring vs. Greenwood, 4 Barn. and Cresw. 281, it was held that money paid by a paymaster to an army officer, could not be recovered back again, or claimed by way of set off, he having been guilty of a breach of duty and of negligence in not communicating to the officer certain information of the disallowance of the claim of the officer, on which the money was paid by the board of ordnance at an earlier period, when his conduct might have been influenced by it. These cases, although not exactly in point with the present, clearly show that even in cases of money paid under a mistake of facts, if the party has been guilty of negligence, or of a breach of his proper duty in the transaction, he is not entitled to recover back the money, if paid, or to retain it, if unpaid, against the other party, whose rights or conduct have been affected by such negligence or breach of duty. We think the principle a sound one, and should not hesitate to adopt it, even if there were no authority to support it. Its application to the circumstances of the present case cannot well be questioned. Here, by the conduct and solemn affirmations, under oath, of the plaintiff, the position of the United States has been entirely changed; the property has been delivered up from the custody of the government, without any search or examination, in the perfect confidence that all was right; and we think the plaintiff is now estopped from setting up his own culpable negligence, to excuse him from the payment of the duties, which, by his own entry and oath, he admitted to be due, and thereby obtained a delivery of the goods.

In this view of the matter, it might not be necessary for the Court to answer the other question, upon which the Court below was divided, as our answer to the first decides the merits of the plaintiff's case. But as the same question is involved in Hardy vs. Hoyt, which has been argued in connexion with the present, we shall now proceed to the consideration of it. The question is, whether silk hose is subject to the payment of the duty imposed on hosiery by the second clause of the second section of the duty act of 1832. ch. 224. That section enacts, that from and after the 3d day of March, 1833, on the articles thereinafter mentioned, there shall be levied, collected, and paid, the following duties: First, wool, unmanufactured, certain duties specified in the first clause. Second, (which is the clause in question,) " On all milled and felled cloth, known by the name of plains, kerseys, or kendal cottons, of which wool shall be the only material, the value whereof shall not exceed thirty-five cents a square yard, five per centum ad valorem; on worsted stuff

goods, shawls, and other manufactures of silk and worsted, ten per centum ad valorem; on worsted yarn, twenty per centum ad valorem; on woollen yarn, four cents per pound, and fifty per centum ad valorem; on mits, gloves, bindings, blankets, hosiery, and carpets and carpetings, twenty-five per cent., except Brussels, Wilton, and treble ingrained carpeting, which shall be at sixty-three cents the square yard, all other ingrained and Venetian carpeting at thirty-five cents the square yard; and except blankets, the value whereof at the place whence exported shall not exceed seventy-five cents each, the duty to be levied upon which shall be five per centum ad valorem; on flannels, bockings, and baizes, sixteen cents the square yard, on warp laces thirty-five per centum; and upon merino shawls made of wool, all other manufactures of wool, or of which wool is a component part, and on ready made clothing, fifty per centum ad valorem." Now, looking to the terms of this clause, and the connexion in which hosiery stands with the other enumerated articles, the natural construction of it would certainly be, that it was restricted to hosiery, ejusdem generis, that is to say, hosiery of wool, or of which wool was a component part. It stands in connexion with mits, gloves, binding, blankets, and carpeting, and the exceptions carved out of it are all articles composed of wool, viz. certain kinds of carpetings and blankets. It is followed by flannels, bockings, and baizes, coach laces, and merino shawls, and then come the sweeping words, "all other manufactures of wool, or of which wool is a component part;" which certainly seem to presuppose that all the preceding enumerated articles were of a kindred nature and fabric. The words "ready made clothing," follow this enumeration, and, therefore, are not necessarily governed by the same interpretation, since they are not inserted as a qualification of the sweeping words already referred to, but stand as an independent descriptive specification, capable of being applied to every variety of ready made clothing, whatever may be the fabric. No argument, therefore, can properly be derived from this part of the clause respecting ready made clothing, to control the natural deductions arising from the antecedent language of the same clause.

But the case before us does not turn upon the interpretation of the second clause standing alone, but it is materially affected by the fifteenth clause of the same section of the act, which prescribes a rate of duty on manufactures of silk, in the following words: "On all manufactures of silk or of which silk shall be a component part, coming from beyond the Cape of Good Hope, ten per centum ad valorem, and on all other manufactures of silk, or of which silk is a component part, five per centum ad valorem, except sewing silk, which shall be forty per centum ad valorem." Now, this language in its positive import, includes all manufactures of silk except sewing silk; and the very exception of sewing silk, lends additional force to the conclusion, that no other manufactures of silk were intended to be excepted from the operation of the clause, upon the well known maxim, that an exception in a statute amounts to an

affirmation of the application of its provisions to all other cases not excepted. Upon what ground, then, can this Court say, that silk hose, being a manufacture of silk, is not solely and exclusively liable to the duty imposed by the fifteenth clause of the section? Upon none, unless it manifestly appears to be repugnant to some other provision of the statute. No such repugnancy exists if we construe the word "hosiery," in the second clause of the second section to mean, as in its natural connexion it imports, hosiery of wool, or of which wool is a component part. On the other hand, if we construe "hosiery" in this connexion, to include silk hose, then all other manufactures of silk, except sewing silk, are not governed by the fifteenth clause; and thus we create a positive repugnancy between the second and fifteenth clauses. Now, it is the duty of Courts of Justice so to construe all statutes as to give full effect to all the words in their ordinary sense, if this can be properly done; and thus to preserve the harmony of all the provisions. And besides, if we are to create an implied exception as to hosiery, the same rule might be applied to silk mits, silk gloves, and silk bindings; and if there are such articles, to carpetings of silk. Indeed, there would be no end to implied exceptions. If the legislature meant specially to except silk hose, or any other particular manufactures of silk from the general language, the natural course would have been to have placed them as exceptions with sewing silk; and the omission is, in our judgment, conclusive to show that none others were intended.

If we look back to the duty act of the 19th of May, 1828, ch. 55, which the act of 1832 was designed in a great measure to modify or supersede, and in which, for the first time in our legislature, "hosiery" is mentioned, eo nomine; there cannot be a doubt that the legislative intention, then, was confined to woollen hosiery. The second clause of the second section of that act is in the following words: "On manufactures of wool, or of which wool shall be a component part, except carpeting, blankets, worsted stuff goods, bombazines, hosiery, mits, gloves, caps, and bindings, the actual value of which at the place whence imported shall not exceed fifty cents the square yard, shall be deemed to have cost fifty cents the square yard, and be charged with a duty of forty per centum ad valorem, &c., &c." The third, fourth, fifth, and sixth clauses of the same section lay a particular duty on other manufactures of wool, "except as aforesaid;" and then the seventh, taking up the exception, says, "on woollen blankets, hosiery, mits, gloves, and bindings, twenty-five per cent. ad valorem. On clothing ready made, fifty per centum ad valorem." It is impossible, reading these clauses in connexion, not to perceive that the exceptions in the second clause, are wholly of fabrics of wool, or of which wool is a component material; for every exception must be considered in such a case to be of something ejusdem generis. Then follows in the sixth clause, " On all manufactures of silk, or of which silk is the component material, coming from beyond the Cape of Good

[William B. Bend *vs.* Jesse Hoyt.]

Hope, a duty of twenty per centum ad valorem, &c.; and on all other manufactures of silk, or of which silk shall be a component material, twenty per centum ad valorem." Construing, hen, these acts as being in pari materia, if we were at liberty to look beyond the act of 1832, to the antecedent state of the law on this subject, the duty on hosiery, as such, was confined to hosiery of wool, or of which wool is a component part.

But if any doubt could be entertained upon the act of 1832, ch. 224, interpreted by itself, or by the antecedent laws, we think none whatsoever can be entertained as to the true intendment and operation of the act of 2d of March, 1833, ch. 354. That act in the fourth section, expressly enacts, that in addition to the articles then exempted from duty by the act of 1832, and other existing laws, from the payment of duties, the following articles, imported from and after the 31st of December, 1833, and until the 30th of June, 1842, shall also be admitted free from duty; "to wit, bleached and unbleached linens, table linen, linen napkins, and linen cambrics, and worsted stuff goods, shawls, and other manufactures of silk and worsted, manufactures of silk, or of which silk shall be the component material of chief value, coming from this side of the Cape of Good Hope, except sewing silk." This section, in express terms, declares that manufactures of silk coming from this side of the Cape of Good Hope, (which is the very predicament of the silk hose in question,) except sewing silk, shall be free from duty. And it would violate every rule of interpretation to hold, that where the legislature had declared all manufactures of silk, except one, free from duty, the Court should create other exceptions by its own authority, without any express or implied intent on the part of the legislature, manifested in the context to warrant such exceptions.

Upon the whole, we are of opinion, first, that upon the facts stated, the present action is not maintainable: and, secondly, that silk hose is free of duty under the act of 1833. A certificate will be sent to the Circuit Court, accordingly.

Mr. Justice Thompson, dissenting.

The amount in controversy in this case is too small to attach mucn importance to it, on that account. But the principle involved in the decision, and the practical effect it is to have upon the course of business at the customhouse, between the merchant and collector; must be my excuse for publicly dissenting from the opinion of the Court, in a case apparently of so little importance in itself.

I fully concur in that part of the opinion which exempts the goods in question (silk hosiery) from the payment of any duty; but dissent from that part which exonerates the collector from an action to recover back the duties received by him without any authority warranted by law.

The only question presented by the point certified to this Court, is whether the plaintiff is entitled to recover from the collector a sum of money, admitted to have been paid to him by mistake, without

the least colour or suspicion of fraud or misconduct on the part of the plaintiff; and the mistake made known to the collector before the money was actually paid, and a claim interposed to have it deducted from his bond. The opinion of the Court upon the other point certified, settles the question that the silk hosiery on which the duty was paid, was not subject to duty. The money was therefore in the hands of the collector, without any right whatever to hold it, and exacted in violation of law; not a voluntary payment, but demanded under the penalty of a loss of credit at the customhouse, if the bond was not paid. If, under such circumstances, the money cannot be recovered back, it must rest upon some stern and unyielding principles of law or public policy, against the manifest justice of the case. But, in my judgment, there are no principles of law or public policy that can uphold such a course on the part of the collector.

But it may be proper to state, a little more particularly, the circumstances under which the money was paid to the collector. Upon the trial in the Circuit Court, an affidavit of the plaintiff was produced and read in evidence by the defendant; and he cannot now be permitted to deny the truth of the facts therein stated. In this affidavit, the plaintiff states, that in March, 1837, he imported from Liverpool, in the ship Roscoe, eight cases and casks of hosiery and gloves, owned by Barker and Adams, manufacturers of Nottingham in England, and consigned by them to him for sale. That his clerk not being able to ascertain from the wording of the invoice, which packages contained gloves and which hosiery, and knowing that cotton gloves and cotton hosiery paid the same duty; he entered them all at the customhouse as cotton gloves, and a duty of twenty-five per cent. was charged upon them by the collector, and he gave bonds for the payment of the duties. That upon an examination of the goods contained in one of the cases, marked B 45, he found them to be spun silk hosiery, and not cotton gloves, as entered at the customhouse. That the goods are called upon the original invoice passed at the customhouse, "spun knots," a term well known in the trade to be applied to hosiery of silk only; and that he verily believed, that the error of entry of the said case as paying duty, arose from the ignorance of the clerk who made the entry. That he did not upon this, nor does he upon any occasion examine whether the customhouse entries made by his clerk are correct. And he further swears, that he had never sold any part of that case; and that, to the best of his knowledge and belief, nothing had been taken from or added to it, but that it was in every respect in the same condition as it was when he received it.

This deposition establishes, beyond all controversy, that the entry was a pure mistake. And suppose it arose from the ignorance of the clerk in not understanding the kind of goods called spun knots? It was equally the ignorance of the customhouse officer who received the entry; for not only the oath upon which the entry was made, states that the original invoice was presented to the collector, upon which the article is denominated spun knots; but it is required by

[William B. Bend *vs.* Jesse Hoyt.]

law, that the original invoice should be produced to the collector at the time the entry is made, 1 Story, 606, s. 36. He had therefore the same means of knowing what the cases contained, as the clerk who made the entry, the cases not having been opened or examined. It was, therefore, a case of mutual error or mutual ignorance. There are no grounds whatever for charging the plaintiff with negligence in this case. He pursued the ordinary course of business. Entries at the customhouse are usually made by clerks. But if no mistake made by a clerk can be corrected, every merchant will be obliged to submit in silence to all losses occasioned by mistakes, or attend in person to make his entries; which will be entirely changing the course of business. But suppose the plaintiff himself had made the mistake; can it be that it is beyond the reach of the law to correct such mistakes. The rule now laid down by the Court would equally extend to such a case. If there are any grounds whatever to suspect fraud or imposition, it is open to inquiry. But to close the door against correcting innocent mistakes, on any supposed ground of public policy, is applying a very severe rule to the transaction of business at the customhouse, and one that, in my judgment, is not called for to protect the revenue of the country. And the very form of the oath required by law to be made on the entry, presupposes that mistakes may be committed, and provides for the correction of them. The person on whose oath the entry is made, swears that the invoice and bill of lading presented to the collector, is the true and only invoice of the goods received, and that the entry contains a just and true account of the goods according to the invoice and bill of lading, and that nothing to his knowledge has been suppressed or concealed, whereby the United States may be defrauded of any part of the duty lawfully due on the said goods; and that if at any time thereafter, he discovers any error in the invoice, or in the account rendered of the goods, &c., he will immediately make the same known to the collector. There is nothing in this case to take it out of the rule of law applicable to ordinary innocent mistakes.

The original invoice was produced and laid before the collector as by law required, to be examined and compared with the entry; in which invoice the goods are denominated spun knots. If, therefore, there was any supposed error in the clerk in entering them as gloves, it was the duty of the collector to have corrected the error; and he is as much chargeable with negligence as the clerk. But the reason why no notice was taken of it, doubtless, was, that it was altogether unimportant in the view of the collector: for he considered the duty chargeable upon the goods as hosiery, and that it was perfectly immaterial whether it was cotton or silk hosiery.

There is nothing in the case to show that the error or mistake was not immediately made known to the collector, as soon as it was discovered; or that the collector made any objection to correcting it on that account. And it was in proof that it was made known to him, before the duties were paid. It having been settled by this

Court, that according to the true construction of the acts of Congress, no duties could be demanded upon this hosiery, there can be no doubt that if the plaintiff had not paid the duties, but suffered his bond to be prosecuted, this mistake in the estimate of duties might have been set up by way of defence, and deduction from the bond. The bond is not given for the payment of any sum certain for the duties; but in a penalty sufficient to cover the supposed amount, with a condition to pay the amount of duties to be ascertained upon the goods in the entry referred to, 1 Story, 629, s. 62: and the question is therefore open to inquiry, what was the amount due upon the goods contained in such entry, if any error or mistake has occurred. But the obligors in the bond cannot permit themselves to be sued, without forfeiting their credit at the customhouse; for the act of Congress declares, that no person whose bond has been received either as principal or surety for the payment of duties, and which bond may be due and unsatisfied, shall be allowed a future credit for duties, until such bond shall be fully paid or satisfied. And the merchant had better submit to the imposition of paying illegal duties, especially if they are of small amount, than to have his credit suspended at the customhouse until he can try the question in a suit upon the bond. Money exacted under such circumstances, is but little short of duress, if the collector is protected from any suit to recover it back. I cannot believe that there is any principle of law or public policy, that can be permitted to work such injustice. Due notice was given to the collector before the bond fell due of the mistake, and a claim to have the deduction made upon the bond; and no pretence on the part of the collector that the notice came too late, or any suggestion of fraud or unfair conduct on the part of the plaintiff. The collector therefore acted with full knowledge of all the facts—and indeed under an implied admission of the mistake. For he professed to act under the instructions of the comptroller of the treasury, that no errors of fact could be corrected after the merchandise had passed beyond the control of the officers of the customs. If such be the rule of the customhouse, no errors or mistakes can be corrected, unless every package of goods shall be opened and examined at the public stores before being delivered to the merchant, which would be contrary to the uniform course of business. But I trust the instructions of the comptroller are not to be assumed as law.

Although instructions from the treasury department may afford an apology for the collector, and exonerate him from any intentional violation of duty, yet it can never be admitted, that they can shield him from all responsibility, when not warranted by the rules and principles of law. If any authority is necessary to support this position, it will be found in the case of Elliot vs. Swartwout, 10 Peters, 153, where it is expressly laid down, that instructions from the treasury department cannot change the law or affect the rights of the parties: that the collector is not bound to take and adopt such instructions, but is at liberty to judge for himself, and act

[William B. Bend *vs.* Jesse Hoyt.]

accordingly. And, in that case, the personal responsibility of the collector is fully examined; and his liability held to be governed by the fact, whether he has paid over the money to the treasury before any notice of a claim to have it refunded has been given to him. And it is there settled, that where the money has been paid over to the treasury, without any notice or objection to its being paid over, it is to be considered a purely voluntary payment; and no suit can be maintained against the collector to recover it back: but when, at the time of payment, notice is given to the collector that the duties are charged too high, and accompanied with a declaration, by the party paying the money, that he intends to prosecute him to recover back the amount erroneously paid, in such case the collector is personally liable. And the Court add, that such must necessarily be the rule, unless the broad proposition can be maintained, that no action will lie against a collector to recover back an excess of duties paid him, but that recourse must be had to the government for redress. Such a principle, say the Court, would be extending an exemption to a public officer, beyond any protection sanctioned by any principle of law or sound public policy. And numerous cases in the English Courts are referred to, where suits have been maintained against public officers, to recover back money paid to obtain a release and discharge of goods seized, which were not liable to seizure: the Courts observing, that the revenue laws ought not to be made the means of oppressing the subject. And if an action would lie to recover back money paid to obtain possession of goods illegally seized, the same principle will sustain an action to recover back money illegally exacted, under the penalty of forfeiting all credit at the customhouse, due notice having been given to the collector not to pay it over to the treasury. The true doctrine on this subject is laid down in the case of Bize *vs.* Dickason, 1 Term. Rep. 286. Lord Mansfield there said the rule had always been, that if a man has paid what the law would not have compelled him to pay, but what in equity and conscience he ought to pay, he cannot recover it back in an action for money had and received: but where money is paid under a mistake, which there was no ground to claim in conscience, the party may recover it back again in this kind of action. If this be the true rule, of which I think there can be no doubt, the plaintiff has a right to recover back the money in this case. It is fully proved that it was included in his bond by mistake, and was held by the collector, without any right in law or conscience to retain it; and payment of the bond was exacted under the penalty of forfeiture of credit at the customhouse. If an action against the collector cannot be maintained to recover back money paid under such circumstances, it is difficult to conceive a case that would sustain an action.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the southern district of New York; and on the points and questions on which the judges

VOL. XIII.—2 A

of the said Court were opposed in opinion, and which were certified to this Court for its opinion, agreeably to the act of Congress in such case made and, provided; and was argued by counsel. On consideration whereof, it is the opinion of this Court, First, that upon the facts stated in the case, the plaintiff, Bend, is not entitled to recover back the excess of duties paid by him on the package number 45, as mentioned in the case. And, Secondly, that silk hose is entitled to be admitted to entry free of duty, under the act of the 2d of March, 1833, entitled, "An act to modify the act of the 14th of July, 1832, and all other acts imposing duties on imports;" which declares that all manufactures of silk, or of which silk is the component material of chief value, coming from this side of the Cape of Good Hope, except sewing silk, shall be free of duty. Whereupon it is ordered and adjudged by this Court, that it be so certified to the said Circuit Court; and that this cause be remanded to the said Court, that further proceedings may be had therein according to law.