GIBSON, Appellant,

v.

DONAHUE, Appellee.

[Cite as *Gibson v. Donahue,* 148 Ohio App.3d 139, 2002-Ohio-194.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–010265.

Decided Jan. 18, 2002.

Baker & Hostetler LLC and Rodney L. Drinnon, for appellant.

Matthew Skinner, for appellee.

---

MARK PHILIP PAINTER, Presiding Judge.

{¶ 1} There are no zebras in this case; but there could be. The trial court based its ruling on Ohio's equine liability immunity law, which defines an "equine" as "a horse, pony, mule, donkey, hinny, zebra, zebra hybrid, or alpaca."[1] (A similar Florida statute[2] defines an equine as "a horse, pony, mule, or donkey," leaving one to speculate whether hinny, zebra, zebra hybrid, and alpaca riding are more common—or more deserving of protection—in Ohio than in Florida.) But in our case, a horse is a horse.

{¶ 2} This is a case of first impression in Ohio, probably because no one before has been audacious enough to try to ride the statute to immunity in a case like this one. The trial court granted summary judgment. We reverse.

---

1. R.C. 2305.321(A)(1).

2. Fla.Stat. 773.01.

*Donahue's Dogs Chase Gibson's Horse, Causing it to Throw Gibson*

{¶ 3} Appellant, Ann Sergeant Gibson, was injured after being thrown by her horse while riding in Clippenger Field, located in the City of the Village of Indian Hill (yes, that is its official name). Appellee Susan Donahue owned two full-grown Irish Setters that she allowed to run off-leash in the field, even though the field was clearly marked "THIS AREA RESTRICTED TO EQUESTRIAN USE ONLY." Donahue's dogs chased Gibson's horse, causing the horse to throw Gibson into a tree with sufficient force to break her helmet. She suffered serious injuries.

{¶ 4} The facts are simple enough, but lawyers and legislators can make things seem complicated. Somehow, Donahue's lawyers found R.C. 2305.321, entitled "Immunity as to equine activity risks," which is noteworthy mainly for using the word "farrier" ten times. Because the statute is a bit obscure, we have included it here in its entirety, as an appendix.

{¶ 5} We have found only one Ohio case interpreting this gem of legislative drafting, but that case is not helpful to our issues here.[3] We have also searched in vain for any way that this statute has anything to do with this case.

*Three Hurdles*

{¶ 6} Gibson's first assignment of error asserts that summary judgment was improper. We review the grant of summary judgment in favor of Donahue de novo, using the same standard that the trial court applied.[4] Under Civ.R. 56(C), summary judgment for Donahue was appropriate if (1) there was no genuine issue of material fact, (2) Donahue was entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for Gibson, reasonable minds could only reach a conclusion adverse to Gibson.[5]

{¶ 7} For Donahue to prevail, she had to clear three legal hurdles by establishing that (1) Indian Hill was the "sponsor" of an "equine event," (2) Gibson was engaging in an "equine activity" as defined by the statute, and (3) the immunity granted to the sponsor also shielded anyone else. And, as Judge Hildebrandt notes in his concurrence, even if all those hurdles were jumped, another section of the law might trump the equine act.

---

3. *Allison v. Johnson* (June 2, 2001), Trumbull App. No. 2000–T–0116, 2001 WL 589384.

4. See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243, 1245.

5. See *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 204, citing *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus.

{¶ 8} The first hurdle is questionable at best, the second even more so, but the third is insurmountable in this case. And, as far as we know, Donahue does not even have a horse, only two dogs.

### Did Indian Hill Sponsor Gibson's Ride?

{¶ 9} The trial court, in granting summary judgment, held that Indian Hill was immune as a "sponsor" of an equine activity. That may or may not be so, but Indian Hill was not even sued. Donahue was sued.

{¶ 10} While it is true that riders must pay a fee to Indian Hill to ride over *any* property in the city, we are skeptical that this fact alone would make Indian Hill a "sponsor" of any person riding within the city. The city manager of Indian Hill testified as follows:

{¶ 11} "Q: Okay. Is it fair to say that you don't sponsor any type of equestrian events in Clippenger Field?

{¶ 12} "MR. SKINNER: Objection.

{¶ 13} "MR. PHILLIPS: Objection. Calls for legal conclusion. You can answer.

{¶ 14} "A: You know, I've read that section of the law, it's—to me it's tough to read so—

{¶ 15} "BY MR. DRINNON: I'm trying to do the best I can.

{¶ 16} "A: I really—I don't have a conclusion on that as to how we fit into that section of law in terms of what is sponsored and what is an activity."

{¶ 17} If the meaning of "sponsor" calls for a legal conclusion, then it should be defined in the statute, which it is not. "Equine activity sponsor" is purportedly defined, but it is not a true, but a circular definition—one that uses the word itself to define itself. "Sponsor" is not defined at all. Lacking a statutory definition, we resort to dictionaries. Black's Law Dictionary states that a sponsor is "1. One who acts as a surety for another. 2. A legislator who proposes a bill. 3. *Civil law.* One who voluntarily intervenes for another without being requested to do so."[6] The only definition of sponsor in Webster's Third International Dictionary, Unabridged, that could be relevant here is "one who assumes responsibility for some other person or thing."[7]

---

6. Black's Law Dictionary (7th Ed.1999) 1410.

7. Webster's Third International Dictionary, Unabridged (1993) 2204.

{¶ 18} Neither definition seems to help Indian Hill, much less Donahue. "Sponsor" as a verb is defined as "to be or stand sponsor for: accept responsibility for."[8] Of course, the statute seeks to *avoid* responsibility, not to accept it.

{¶ 19} Perhaps we can glean from the definitions and the statute that the latter seeks to immunize a person or entity that would otherwise be regarded as taking responsibility for an equine activity. Thus interpreted, it makes some sense—why write a statute to immunize activity that would give rise to no liability in the first place? If Indian Hill had indeed sponsored an event, and Gibson's horse had fallen because of a gopher hole in the field, she might have made a case against the sponsor of the event. In that instance, the statute arguably would have immunized Indian Hill, the sponsor, from that type of "inherent risk of equine activity." The legislature obviously intended to grant just such immunity. (When the statute is digested, it seems only to immunize activity that would not have given rise to liability under the common law in the first place.) Even had Indian Hill sponsored an event, if Donahue had loosed her dogs to chase the horses in a sponsored event, the immunity would not have shielded her—only the sponsor.

{¶ 20} But even were we to hold that the first hurdle—sponsorship—could be jumped, there are still two more, each progressively higher.

### *Was Gibson Engaged in an "Equine Activity"?*

{¶ 21} We are also skeptical that simply riding one's own horse is "equine activity" as defined in the statute. As we have seen, a ride that is "sponsored" might fit, but an unsponsored ride would not, at least under Ohio's statute. Some states define "equine activity" much more broadly than does Ohio. For instance, North Carolina defines it as "any activity involving an equine."[9]

{¶ 22} But, under the definition in Ohio's statute,[10] just riding one's own horse in a non-sponsored event is not "equine activity." But whether it could be or not, the next hurdle is far too high for Gibson to surmount.

### *"Anyone in the World"?*

{¶ 23} Donahue next contends that the language of the statute immunizes *anyone*. She cites this language: "an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, *or other person* is not liable

---

**8.** Id.

**9.** N.C.Gen.Stat. 99E–1(3).

**10.** See R.C. 2305.321(A)(2)(a) in Appendix.

in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity." [11] (Emphasis added.)

{¶ 24} For Donahue to prevail, we would have to read the phrase as "equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, *or any other person in the whole world.*"

{¶ 25} A person who negligently crashes an airplane into the crowd at an equine event would thus be immune from liability, at least for injuries to thrown riders, as would someone who lets his or her dog run out in the middle of a steeplechase.

{¶ 26} The old legal maximum ejusdem generis surely applies here: "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated."[12] Words like "any other person" will be read as any other of like kind. "There is a general expression, 'other person whatsoever;' but, according to a well established rule in the construction of statutes, general terms following particular ones apply only to such persons or things as are *ejusdem generis* with those comprehended in the language of the legislature."[13]

{¶ 27} The Ohio Supreme Court has frequently applied ejusdem generis as a canon of construction: "where in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term having perhaps a broader signification is conjoined, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms."[14]

{¶ 28} The newest edition of Black's Law Dictionary states, "For example, in the phrase *horses, cattle, sheep, pigs, goats, or any other barnyard animal,* the general language *or any other barnyard animal* * * * would probably be held to include only four-legged, hoofed mammals." [15] (Emphasis sic.) Similarly,

11. R.C. 2305.321(B)(1).

12. *Light v. Ohio Univ.* (1986), 28 Ohio St.3d 66, 68, 28 OBR 165, 502 N.E.2d 611, 613, citing *State v. Aspell* (1967), 10 Ohio St.2d 1, 39 O.O.2d 1, 225 N.E.2d 226.

13. *Reg. v. Cleworth* (1864), 4 B. & S. 927.

14. *State v. Aspell* (1967), 10 Ohio St.2d 1, 39 O.O.2d 1, 225 N.E.2d 226, paragraph two of the syllabus.

15. Black's Law Dictionary (7th Ed.1999) 535; see, also, 2A Sutherland Statutory Construction (1992 Ed.), Section 47.17.

"* * *[b]y the words 'other things,' nothing shall be intended but things of the like nature with those mentioned."[16]

{¶ 29} In the present case, we could interpret the "other person" following the word "farrier," to include "blacksmith," or perhaps "horse of a different color"; but we cannot interpret it to mean "person who lets dogs run loose in an equestrian area."

{¶ 30} The legislature intended to immunize people sponsoring an equine event—not strangers. The equestrian here was the victim of a third party. We do not read the statute as immunizing third parties. In fact, "The underlying purpose of these statutes is to protect equine professionals from liability by eliminating the risk of lawsuits that arise out of the inherent dangers of horseback riding, while not exonerating horse owners from liability for negligence."[17] If those that the statute seeks to immunize—horse and stable owners, farriers and other equine professionals—are not exempt from negligence, it is difficult to imagine that the law immunizes owners of dogs who chase horses.

{¶ 31} We have discovered one case on point, though it has not been cited by the parties. It seems that this very theory was tried in South Dakota, which has a similar statute. There, the defendant, a pipeline company, had left a trench partially unfilled. When the plaintiff's horse fell in the ditch, the pipeline company trotted out the equine liability statute. The South Dakota Supreme Court was not tricked and held, as do we, that "[a]pplying the principle of *ejusdem generis*, 'any other person' is limited to other people involved in equine activities and does not extend blanket immunity. If the legislature intended to provide immunity to all people, it would not have specifically listed those entitled to immunity."[18] Just so.

### A Hurdle Too High

{¶ 32} Thus, whether or not Donohue could jump the first two hurdles to immunity, which seems at best doubtful, the last one is a wall, not a hurdle. It is beyond cavil that the equine immunity statute was not intended to, should not, and does not apply to dog owners who allow their dogs to chase horses.

{¶ 33} We do note, however, that the legislature has enacted statutes relevant to this case—see R.C. 955.22(C) (confinement or restraint of dogs); R.C.

---

16. *Sprigg v. Weems* (Md.1789), 2 H. & McH. 266. See, also, *Bend v. Hoyt* (1839), 38 U.S. 263 (13 Pet. 263), 10 L.Ed. 154.

17. McEvoy, The Rise of Equine Activity Liability Acts (1997), 3 Animal L. 201, 215.

18. *Nielson v. AT&T Corp.* (S.D.1999), 597 N.W.2d 434, 439.

955.28(B) (liability of dog owner for damages). We do not need to consider whether the latter statute would trump the equine statute, because we hold that the equine statute simply does not apply in this case.

{¶ 34} We sustain Donahue's first assignment of error and reverse the trial court's grant of summary judgment. We remand the case for further proceedings consistent with this opinion. While we are tempted to address Donahue's second assignment—that R.C. 2305.321 is unconstitutionally vague—our holding makes that issue moot.

Judgment reversed<br>and cause remanded.

GORMAN, J., concurs.

HILDEBRANDT, J., concurs separately.

HILDEBRANDT, Judge, concurring separately.

{¶ 35} I concur in judgment, but write separately because I believe that other Ohio statutes, relevant to this case, control.

{¶ 36} As Judge Painter notes in the conclusion of his opinion, there are statutes that specifically proscribe Donahue's conduct in this matter. R.C. 955.22(C) mandates that a dog owner shall restrain his or her dog by, inter alia, a leash except when the dog, accompanied by its owner, is lawfully engaged in hunting. Failure to keep a dog restrained, in violation of this statute, is a strict-liability offense.[19] Further, R.C. 955.28(B) imposes liability upon a dog owner for damages as a result of any injury or loss to a person that is caused by the dog unless the injured person has committed certain criminal acts against the dog owner or has abused the dog upon its owner's property.

{¶ 37} In my opinion, R.C. 2305.321 irreconcilably conflicts with the special provisions of R.C. 955.22 and 955.28. Accordingly, these special provisions prevail.[20] The trial court should have not entertained the equine statute as a defense to Donahue's claims but, instead, should have relied on R.C. 955.22 and 955.28, which impose strict liability upon a dog owner for damages caused by the dog. Accordingly, Donahue was not entitled to judgment as a matter of law.

---

19. *State v. Squires* (1996), 108 Ohio App.3d 716, 671 N.E.2d 627; *State v. Judge* (Apr. 19, 1989), Hamilton App. No. C–880317, 1989 WL 36676.

20. R.C. 1.51; see *State v. Judge,* supra.

**148**

*Appendix*

{¶ 38} R.C. 2305.321. **Immunity as to equine activity risks.**

{¶ 39} (A) As used in this section:

{¶ 40} (1) "Equine" means a horse, pony, mule, donkey, hinny, zebra, zebra hybrid, or alpaca.

{¶ 41} (2)(a) "Equine activity" means any of the following:

{¶ 42} (i) An equine show, fair, competition, performance, or parade that involves an equine and an equine discipline, including, but not limited to, dressage, a hunter and jumper show, grand prix jumping, a three-day event, combined training, a rodeo, driving, pulling, cutting, reining, team penning, barrel racing, polo, steeplechasing, English or western performance riding, endurance or nonendurance trail riding, western games, hunting, packing, and recreational riding;

{¶ 43} (ii) An equine or rider training, teaching, instructing, testing, or evaluating activity, including, but not limited to, a clinic, seminar, or symposium;

{¶ 44} (iii) The boarding of an equine, including, but not limited to, normal daily care of an equine;

{¶ 45} (iv) The trailering, loading, unloading, or transporting of an equine;

{¶ 46} (v) The riding, inspecting, or evaluating of an equine owned by another person, regardless of whether the owner has received anything of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect, or evaluate it;

{¶ 47} (vi) A ride, trip, hunt, branding, roundup, cattle drive, or other activity that involves an equine and that is sponsored by an equine activity sponsor, regardless of whether the activity is formal, informal, planned, or impromptu;

{¶ 48} (vii) The placing or replacing of horseshoes on an equine, the removing of horseshoes from an equine, or the trimming of the hooves of an equine;

{¶ 49} (viii) The provision of or assistance in the provision of veterinary treatment or maintenance care for an equine;

{¶ 50} (ix) The conducting of procedures or assistance in the conducting of procedures necessary to breed an equine by means of artificial insemination or otherwise.

{¶ 51} (b) "Equine activity" does not include horse or mule racing.

{¶ 52} (3) "Equine activity participant" means a person who engages in any of the following activities, regardless of whether the person is an amateur or a professional or whether a fee is paid to participate in the particular activity:

{¶ 53} (a) Riding, training, driving, or controlling in any manner an equine, whether the equine is mounted or unmounted;

{¶ 54} (b) Being a passenger upon an equine;

{¶ 55} (c) Providing medical treatment to an equine;

{¶ 56} (d) Conducting procedures or assisting in conducting procedures necessary to breed an equine by means of artificial insemination or otherwise;

{¶ 57} (e) Assisting a person who is engaged in an activity described in division (A)(3)(a), (b), (c), or (d) of this section;

{¶ 58} (f) Sponsoring an equine activity;

{¶ 59} (g) Being a spectator at an equine activity.

{¶ 60} (4) "Equine activity sponsor" means either of the following persons:

{¶ 61} (a) A person who, for profit or not for profit, sponsors, organizes or provides a facility for an equine activity, including, but not limited to, a pony club, 4 H club, hunt club, riding club, or therapeutic riding program, or a class, program, or activity that is sponsored by a school, college, or university;

{¶ 62} (b) An operator or promoter of, or an instructor at, an equine facility, such as a stable, clubhouse, pony ride, fair, training facility, show ground, or arena at which an equine activity is held.

{¶ 63} (5) "Equine professional" means a person who engages for compensation in any of the following activities:

{¶ 64} (a) Training, teaching, instructing, testing, or evaluating an equine or an equine activity participant;

{¶ 65} (b) Renting to an equine activity participant an equine for the purpose of riding, driving, or being a passenger upon an equine;

{¶ 66} (c) Renting equipment or tack to an equine activity participant for use in an equine activity;

{¶ 67} (d) Providing daily care to an equine boarded at an equine activity;

{¶ 68} (e) Providing or assisting in providing veterinary treatment or maintenance care to an equine;

{¶ 69} (f) Conducting procedures or assisting in conducting procedures necessary to breed an equine by means of artificial insemination or otherwise.

{¶ 70} (6) "Harm" means injury, death, or loss to person or property.

{¶ 71} (7) "Inherent risk of an equine activity" means a danger or condition that is an integral part of an equine activity, including, but not limited to, any of the following:

{¶ 72} (a) The propensity of an equine to behave in ways that may result in injury, death, or loss to persons on or around the equine;

{¶ 73} (b) The unpredictability of an equine's reaction to sounds, sudden movement, unfamiliar objects, persons, or other animals;

{¶ 74} (c) Hazards, including, but not limited to, surface or subsurface conditions;

{¶ 75} (d) A collision with another equine, another animal, a person, or an object;

{¶ 76} (e) The potential of an equine activity participant to act in a negligent manner that may contribute to injury, death, or loss to the person or the participant or to other persons, including, but not limited to, failing to maintain control over an equine or failing to act within the ability of the participant.

{¶ 77} (8) "Person" has the same meaning as in section 1.59 of the Revised Code and additionally includes governmental entities.

{¶ 78} (9) "Tort action" means a civil action for damages for injury, death, or loss to person or property. "Tort action" does not include a civil action for damages for a breach of contract or another agreement between persons.

{¶ 79} (10) "Veterinarian" means a person who is licensed to practice veterinary medicine in this state pursuant to Chapter 4741. of the Revised Code.

{¶ 80} (B)(1) Except as provided in division (B)(2) of this section and subject to division (C) of this section, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person is not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity. Except as provided in division (B)(2) of this section and subject to division (C) of this section, an equine activity participant or the personal representative of an equine activity participant does not have a claim or cause of action upon which a recovery of damages may be based against, and may not recover damages in a tort or other civil action against, an equine activity sponsor, another equine activity participant, an equine professional, a veterinarian, a farrier, or another person for harm that the equine activity participant allegedly sustained during an equine activity and that resulted from an inherent risk of an equine activity.

{¶ 81} (2) The immunity from tort or other civil liability conferred by division (B)(1) of this section is forfeited if any of the following circumstances applies:

{¶ 82} (a) An equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person provides to an equine activity participant faulty or defective equipment or tack and knows or should know that the equipment or tack is faulty or defective, and the fault or defect in the equipment or tack proximately causes the harm involved.

{¶ 83} (b) An equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person provides an equine to an equine activity participant and fails to make reasonable and prudent efforts to determine the equine activity participant's ability to safely engage in the equine activity or to safely manage the equine based on the equine activity participant's representations of the participant's ability, the equine activity participant fails to safely engage in the equine activity or to safely manage the equine, and that failure proximately causes the harm involved.

{¶ 84} (c) The harm involved is proximately caused by a dangerous latent condition of the land on which or the premises at which the harm occurs, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person owns, leases, rents or otherwise lawfully possesses and controls the land or premises and knows or should know of the dangerous latent condition, but does not post conspicuously prior to the time of the harm involved one or more signs that warn of the dangerous latent condition.

{¶ 85} (d) An act or omission of an equine activity sponsor, equine activity participant, equine professional veterinarian, farrier, or other person constitutes a willful or wanton disregard for the safely of an equine activity participant and proximately causes the harm involved.

{¶ 86} (e) An equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person intentionally causes the harm involved.

{¶ 87} (C)(1) Notwithstanding the immunity conferred by division (B)(1) of this section and the grounds for its forfeiture specified in division (B)(2) of this section, subject to divisions (C)(2)(b) and (3) of this section, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person is not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity if that equine activity participant or a parent, guardian, custodian, or other legal representative of that equine activity participant voluntarily executes, prior to the occurrence of the harm involved, a written waiver as described in division (C)(2) of this section. Subject to divisions (C)(2)(b) and (C)(3) of this section, the equine activity participant who is the subject of that waiver or the parent, guardian, custodian, or other legal representative of the equine activity participant who is the subject of that waiver does not have a claim or cause of action upon which a recovery of damages may be based against, and may not recover damages in a tort or other civil action against, an equine activity sponsor, another equine activity participant,

an equine professional, a veterinarian, a farrier or another person in whose favor the waiver was executed.

{¶ 88} (2)(a) A valid waiver for purposes of division (C)(1) of this section shall be in writing and subscribed by the equine activity participant or the parent, guardian, custodian, or other legal representative of the equine activity participant, and shall specify at least each inherent risk of an equine activity that is listed in divisions (A)(7)(a) to (e) of this section and that will be a subject of the waiver of tort or other civil liability.

{¶ 89} (b) A waiver in the form described in division (C)(2)(a) of this section shall remain valid until it is revoked in the manner described in division (C)(3) of this section. Unless so revoked, such a waiver that pertains to equine activities sponsored by a school, college, or university shall apply to all equine activities in which the equine activity participant who is the subject of the waiver is involved during the twelve-month period following the execution of the waiver.

{¶ 90} (3) A valid waiver in the form described in division (C)(2)(a) of this section may be revoked in writing by the equine activity participant or the parent, guardian, custodian, or other legal representative of the equine activity participant who executed the waiver. The revocation of the waiver does not affect the availability of the immunity conferred by division (B)(1) of this section.

{¶ 91} (D)(1) This section does not create a new cause of action or substantive legal right against an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person.

{¶ 92} (2) This section does not affect the availability in appropriate circumstances of a civil action based on a product liability claim under sections 2307.71 to 2307.801 of the Revised Code.