44 U.S. 236 (1845)
3 How. 236
WILLIAM F. CARY AND SAMUEL T. CARY, PLAINTIFFS,
v.
EDWARD CURTIS.
Supreme Court of United States.

The cause was argued (in writing) by Sullivan, for the plaintiffs in error, and Nelson, attorney-general, for the defendant.
*237 Sullivan, for plaintiffs.
*239 Mr. Justice DANIEL delivered the opinion of the court.
In order to arrive at the answer which should be given to the question certified upon this record, the objects first to be sought for are the intention and meaning of Congress in the enactment of the 2d section of the act of March 3d, 1839, under which the question sent here has been raised. The positive language of the statute, it is true, must control every other rule of interpretation, yet even this may be better understood by recurrence to the known public practice as to matters in pari materia, and by the rules of law as previously expounded by the courts, and as applied to and as having influenced that practice. The law as laid down by this court with *240 respect to collectors of the revenue, in the case of Elliott v. Swartwout, 10 Peters, 137, and again incidentally in the case of Bend v. Hoyt, 13 Peters, 263, is precisely that which is applicable to agents in private transactions between man and man, viz.: that a voluntary payment to an agent without notice of objection will not subject the agent who shall have paid over to his principal; but that payment with notice, or with a protest against the legality of the demand, may create a liability on the part of the agent who hall pay over to his principal in despite of such notice or protest. Such was the law as announced from this court, and Congress must be presumed to have been cognisant of its existence; and as the peculiar power ordained by the Constitution to prescribe rules of right and of action for all officers as well as others falling within the legitimate scope of federal legislation, they must be supposed to have been equally cognisant of the effects and tendencies of this court's decisions upon the collection of the public revenue. With this knowledge necessarily presumed for them, Congress enact the 2d section of the act of 1839. It should not be overlooked, for it is very material in seeking for the views of Congress in this enactment, that the court, in the case of Elliott v. Swartwout, in its reasoning upon the second point submitted to them, say, that the claimant by giving notice to the collector would "put him on his guard," by requiring him not to pay over the money. They farther say, that the collector would, by the same means, be placed in a situation to claim an indemnity. The precise mode in which this protection of the collector was to be accomplished, or his indemnity secured, it is true, the court have not explicitly declared; but it is thought to be no forced construction of their language to explain it as sanctioning a right of retainer in the collector of the funds received by him for the government; for what shield so effectual could he interpose between himself and the cost and hazards of frequent litigation? Indeed, this would appear, according to the opinion of the court, that very protection which justice and necessity would equally warrant. In practice, this retainer has, with or without warrant, been resorted to.
And now let us look to the language of the act of 1839, chap. 82, § 2. "That from and after the passage of this act, all money paid to any collector of the customs, or to any person acting as such, for unascertained duties, or for duties paid under protest against the rate or amount of duties charged, shall be placed to the credit of the treasurer of the United States, kept and disposed of as all other money paid for duties is required by law, or by regulation of the Treasury Department, to be placed to the credit of the treasurer, kept and disposed of; and it shall not be held by said collector or person acting as such, to await any ascertainment of duties, or the result of any litigation in relation to the rate or amount of duty legally chargeable and collectable in any case where money is so paid: but whenever it shall be shown to the satisfaction of the secretary of the *241 Treasury, that in any case of unascertained duties, or duties paid under protest, more money has been paid to the collector, or to the person acting as such, than the law requires should have been paid, it shall be his duty to draw his warrant upon the treasurer in favour of the person or persons entitled to the over-payment, directing the said treasurer to refund the same out of any money in the Treasury not otherwise appropriated." What is the plain and obvious import of this pro ion, taking it independently and as a whole? It is that all moneys thereafter paid to any collector for unascertained duties, or duties paid under protest, (i.e. with notice of objection by the payer,) shall, notwithstanding such notice, be placed to the credit of the treasurer, kept and disposed of as all other money paid for duties is required by law to be kept and disposed of; that is, they shall be paid over by the collector, received by the treasurer, and disbursed by him in conformity with appropriations by law, precisely as if no notice or protest had been given or made; and shall not be retained by the collector (and consequently not withdrawn from the uses of the government) to await any ascertainment of duties, or the result of any litigation relative to the rate or amount of duties, in any case in which money is so paid.
This section of the act of Congress, considered independently and as apart from the facts and circumstances which are known to have preceded it, and may fairly be supposed to have induced its enactment, must be understood as leaving with the collector no lien upon, or discretion over, the sums received by him on account of the duties described therein; but as converting him into the mere bearer of those sums to the Treasury of the United States, through the presiding officer of which department they were to be disposed of in conformity with the law. Looking then to the immediate operation of this section upon the conclusions either directly announced or as implied in the decision of Elliott v. Swartwout, how are those conclusions affected by it? They must be influenced by consequences like the following: That whereas by the decision above mentioned it is assumed that by notice to the collector, or by protest against payment, a personal liability for the duties actually paid, attaches upon, and that for his protection a correspondent right of retainer is created on his part; it is thereby made known (i.e. by the statute) that under no circumstances in future should the revenue be retained in the hands of the collector: that he should in no instance be regarded by those making payments to him as having a lien upon it, because he is announced to be the mere instrument or vehicle to convey the duties paid into his hands into the Treasury: that it is the secretary of the Treasury alone in whom the rights of the government and of the claimant are to be tested: and that whosoever shall pay to a collector any money for duties, must do so subject to the consequences herein declared. Such, from the 3d day of March, 1839, was the public law of the United States; it *242 operated as notice to every one; it applied, of course, to every citizen as well as to officers concerned in the regulations of the revenue; and as it removed the implications on which the decision of Elliott v. Swartwout materially rested, that case cannot correctly control a question arising under a different state of the law, and under a condition of the parties also essentially different.
It will not be irrelevant here to advert to other obvious and cogent reasons by which Congress may have been impelled to the enactment in question; reasons which, it is thought, will aid in furnishing a solution of their object. Uniformity of imports and excises is required by the Constitution. Regularity and certainty in the payment of the revenue must be admitted by every one as of primary importance: they may be said almost to constitute the basis of good faith in the transactions of the government; to be essential to its practical existence. Within the extended limits of this country are numerous collection-districts; many officers must be intrusted with the collection of the revenue, and persons much more numerous, with every variety of interest and purpose, are daily required to make payments at the ports of entry. To permit the receipts at the customs to depend on constructions as numerous as are the agents employed, as various as might be the designs of those who are interested; or to require that those receipts shall await a settlement of every dispute or objection that might spring from so many conflicting views, would be greatly to disturb, if not to prevent, the uniformity prescribed by the Constitution, and by the same means to withhold from the government the means of fulfilling its important engagements. In the view of mischief so serious, and with the intention of preventing or remedying them, nothing would seem more probable or more reasonable, we might add more necessary, than that the government should endeavour to devise a plan by which, as far as practicable, to retain its fiscal operations within its own control, thereby insuring that uniformity in practice, enjoined by the theory of the Constitution, and that punctuality which is indispensable to the benefit of all. Such a plan has Congress devised in the act in question. We have no doubts of the objects or the import of that act; we cannot doubt that it constitutes the secretary of the Treasury the source whence instructions are to flow: that it controls both the position and the conduct of collectors of the revenue: that it has denied to them every right or authority to retain any portion of the revenue for purposes of contestation or indemnity; has ordered and declared those collectors to be the mere organs of receipt and transfer, and has made the head of the Treasury Department the tribunal for the examination of claims for duties said to have been improperly paid.
It has been urged that the clause of the act of 1839 declaring that the money received shall not be held by any collector to await any ascertainment of duties, or the result of any litigation in relation *243 to the rate or amount of duties legally chargeable and collectable in any case where money is so paid; shows that Congress did not mean to deprive the party of his action of assumpsit against the collector: that litigation of that description was still contemplated, and that the only object of the law was to place the money in dispute in the possession of the treasurer, to await a decision, instead of leaving it in the hands of the collector. The court cannot assent to this construction. It will be remembered that the two principal cases in which collectors have claimed the right to retain, have been those of unascertained duties, and of suits brought, or threatened to be brought, for the recovery of duties paid under protest. It is matter of history that the alleged right to retain on these two accounts, had led to great abuses, and to much loss to the public; and it is to these two subjects, therefore, that the act of Congress particularly addresses itself. It begins by declaring that all money received on these accounts shall be paid into the Treasury; and then, in order to show that the collector is not the person with whom any claims for this money are to be adjusted, or who is to be held responsible for it, the act proceeds to declare that the money shall not remain in his hands even if the protest is followed by a suit: that, notwithstanding suit may be brought against him, he shall still pay the money into the Treasury, and that the controversy shall be adjusted with the secretary. Congress supposed, probably, that a party might choose to sue the collector, as has been done in this instance; but it does not by any means follow, that it was intended to make him liable in the suit, or to give the party the right of recovery against him. The words used go to show, that neither a protest which is mentioned in the first part of the section, nor a suit which is mentioned in the clause of which we are speaking, shall be a pretext or excuse for retaining the money. Suppose the words in relation to a litigation had been omitted, and the law had said, that the collector should not retain the money for any ascertainment of duties, but that the secretary of the Treasury in that case, as well as in the case of duties paid under protest, should adjust the claim and pay what was really due. The omission supposed would have strongly implied that, if there was litigation, he might retain, and it might be said with much show of reason, that by forbidding him to retain for unascertained duties, but not forbidding him to retain in case of litigation for duties paid under protest, implied that he could not retain for the former but might for the latter. We hold it not a logical mode of reasoning where the omission of words would evidently lead to a particular conclusion, to argue that their insertion can do the same thing. Besides, the litigation spoken of, and which is said to lead to this result, is a litigation for duties paid under protest, and not for over-payments of unascertained duties. If these words were intended to sanction suits against collectors for the former, why are litigations *244 for the latter not also countenanced? Independently of this statute, the collector might have been sued for over-payments on unascertained duties as well as for duties paid under protest. And it can hardly be reconciled with reason or consistency that Congress designed to preserve the right of suit in the one case, and to deny it in the other. Yet if these words have the force contended for by the defendant in error, they give the right of action against the collector for duties paid under protest only, leaving the party who has overpaid unascertained and estimated duties, no remedy but that of resorting to the secretary of the Treasury. It would be difficult to assign any good reason for such a diversity; we think none such was intended, that none such in reality exists, that the law intends merely to declare that if the protest is followed by a suit, the duties in that case as well as in the other, shall be paid into the Treasury and shall not remain in the hands of the collector to abide the result of the suit. The conclusion to which we have come upon this statute is greatly strengthened by the act of Congress of May 31st, 1844, chap. 31, which, in suits brought by the United States for the enforcement of the revenue laws, or for the collection of duties due or alleged to be due on merchandise imported, authorizes a writ of error from this court to the Circuit Courts without regard to the sum in controversy. The object of this law undoubtedly was, to obtain uniformity of decision in regard to the duties imposed. Prior to the act of 1839 there were often differences of opinion in the circuits in the construction of the laws, and in instances too in which the amount in controversy was too small to enable either party to bring them here for revisal by writ of error. It can hardly then be imagined that when Congress was taking measures expressly to secure uniformity of decision and practice in relation to the amount of duties imposed by law, they would have confined the writ of error to cases brought by the United States, when they were of small amount, and refused it in suits against collectors in similar controversies, if they supposed that such suits could still be maintained. Indeed it has heretofore been in this latter form that the amount of duties claimed has been far more frequently contested, than by suits brought by the United States. And if this form of trying the question had not been intended to be taken away by the act of 1839, there could have been no reason for excluding it from the act of 1844. For the purposes obviously designed by this law, it would have been much more important to the public to have allowed the writ of error in suits against collectors, than in suits instituted by the United States, supposing suits of the former description to be still maintainable; and the omission of such a remedy strongly implies that the legislature supposed such suits could be no longer maintained.
It is contended, however, that the language and the purposes of Congress, if really what we hold them to be declared in the statute *245 of 1839, cannot be sustained, because they would be repugnant to the Constitution, inasmuch as they would debar the citizen of his right to resort to the courts of justice. The supremacy of the Constitution over all officers and authorities, both of the federal and state governments, and the sanctity of the rights guarantied by it, none will question. These are concessa on all sides. The objection above referred to admits of the most satisfactory refutation. This may be found in the following positions, familiar in this and in most other governments, viz.: that the government, as a general rule, claims an exemption from being sued in its own courts. That although, as being charged with the administration of the laws, it will resort to those courts as means of securing this great end, it will not permit itself to be impleaded therein, save in instances forming conceded and express exceptions. Secondly, in the doctrine so often ruled in this court, that the judicial power of the United States, although it has its origin in the Constitution, is (except in enumerated instances, applicable exclusively to this court) dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress, who possess the sole power of creating the tribunals (inferior to the Supreme Court) for the exercise of the judicial power, and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good. To deny this position would be to elevate the judicial over the legislative branch of the government, and to give to the former powers limited by its own discretion merely. It follows, then, that the courts created by statute must look to the statute as the warrant for their authority; certainly they cannot go beyond the statute, and assert an authority with which they may not be invested by it, or which may be clearly denied to them. This argument is in nowise impaired by admitting that the judicial power shall extend to all cases arising under the Constitution and laws of the United States. Perfectly consistent with such an admission is the truth, that the organization of the judicial power, the definition and distribution of the subjects of jurisdiction in the federal tribunals, and the modes of their action and authority, have been, and of right must be, the work of the legislature. The existence of the Judicial Act itself, with its several supplements, furnishes proof unanswerable on this point. The courts of the United States are all limited in their nature and constitution, and have not the powers inherent in courts existing by prescription or by the common law.
In devising a system for imposing and collecting the public revenue, it was competent for Congress to designate the officer of the government in whom the rights of that government should be represented in any conflict which might arise, and to prescribe the manner of trial. It is not imagined, that by so doing Congress is justly chargeable with usurpation, or that the citizen is thereby deprived *246 of his rights. There is nothing arbitrary in such arrangements; they are general in their character; are the result of principles inherent in the government; are defined and promulgated as the public law. A more striking example of the powers exerted by the government, in relation to its fiscal concerns, than is seen in the act of 1839, is the power of distress and sale, authorized by the act of Congress of May 15th, 1820, (3 Story, 1791,) upon adjustments of accounts by the first comptroller of the Treasury. This very strong and summary proceeding has now been in practice for nearly a quarter of a century, without its regularity having been questioned, so far as is known to the court. The courts of the United States can take cognisance only of subjects assigned to them expressly or by necessary implication; à fortiori, they can take no cognisance of matters that by law are either denied to them or expressly referred ad aliud examen.
But whilst it has been deemed proper, in examining the question referred by the Circuit Court, to clear it of embarrassments with which, from its supposed connection with the Constitution, it is thought to be environed, this court feel satisfied that such embarrassments exist in imagination only and not in reality: that the case and the question now before them present no interference with the Constitution in any one of its provisions, and may be, and should be disposed of upon the plainest principles of common right. In testing these propositions it is proper to recur to the case of Elliott and Swartwout, and again to bring to view the grounds on which that case was ruled. It was, unquestionably, decided upon principles which may be admitted in ordinary cases of agency, which expressly recognise the right, nay, the duty of the agent to retain, and make his omission so to retain an ingredient in the gravamen or breach of duty, whence his liability and his promise are implied by the law. The language of the court, 10 Peters, 154, is this: "There can be no hardship in requiring the party to give notice to the collector that he considers the duty claimed illegal, and put him on his guard by requiring him not to pay over the money. The collector would then be placed in a situation to claim an indemnity from the government. But if the party is entirely silent, and no intimation is given of an intention to seek repayment of the money, there can be no ground upon which the collector can retain the money, or call upon the government to indemnify him against a suit." Here then the right and the duty of retainer are sanctioned in the officer; without them the notice spoken of would be nugatory  a vain act, which the law never requires. And this right and this duty in the officer, and this injunction of notice to him, must all be understood and are propounded in this decision as principles or precepts of the law, with the knowledge of which each of the parties must stand affected.
The action of assumpsit for money had and received, it is said by Ld. Mansfield, Burr. 1012, Moses v. Macfarlen, will lie in general whenever the defendant has received money which is the property *247 of the plaintiff, and which the defendant is obliged by the ties of natural justice and equity to refund. And by Buller, Justice, in Stratton v. Rastall, 2 T.R. 370, "that this action has been of late years extended on the principle of its being considered like a bill in equity. And, therefore, in order to recover money in this form of action the party must show that he has equity and conscience on his side, and could recover in a court of equity." These are the general grounds of the action as given from high authority. There must be room for implication as between the parties to the action, and the recovery must be ex equo et bono, or it can never be. If the action is to depend on the principles laid down by these judges, and especially by Buller, a case of hardship merely could scarcely be founded upon them; much less could one of injustice or oppression, nor even one which arose from irregularity or indiscretion in the plaintiff's own conduct. So far as the liability of agents in this form of action appears to have been considered, the general rule certainly is, that the action should be brought against the principal and not against a known agent, who is discharged from liability by a bonâ fide payment over to his principal, unless anterior to making payment over he shall have had notice from the plaintiff of his right and of his intention to claim the money. The absence of notice will be an exculpation of the agent in every instance. And with regard to the effect of the notice in fixing liability upon the agent, that effect is dependent on the known powers of the agent and the character of his agency. If, for instance, the agent was known to be a mere carrier or vehicle to transfer to his employer the amount received, payment to the agent with such knowledge, although accompanied with a denial of the justice of the demand, would seem to exclude every idea of an agreement express or implied on the part of the agent to refund; and could furnish no ground for this action against the agent who should pay over the fund received to his principal. This doctrine is believed to be sanctioned by the cases of Greenaway v. Hurd, 4 T.R. 553, of Coles v. Wright, 4 Taunt. 198, and of Tope v. Hockin, 7 Barn. & Cres. 101. 'Tis true that the case in Taunt. and that from Barn. & Cres. were not instances of payment under protest; but the case from 4 T.R. has this common feature with that before us, that it was an action against an excise officer for duties said to have been illegally collected, in which the plaintiff denied the legality of the demand, though he subsequently paid it. But all three of these cases concur in condemning the harshness of a rule which would subject an agent, who is a mere channel of conveyance or delivery of the amount which might pass through his hands. Neither of these cases was affected by a positive statutory mandate requiring the agent to make payment over to his principal.
Another principle held to be fundamental to this action is this: that there must exist a privity between the plaintiff and defendant; something on which an obligation, an engagement, a promise from *248 the latter to the former can be implied; for if such implication be excluded from the relation between the parties by positive law, or by inevitable legal intendment, every foundation for the promise and of the action upon it is destroyed; for none can be presumed or permitted to promise what either law or reason does not warrant or may actually forbid. Thus, where bankers received bills from their foreign correspondents, with directions to pay the amount to the plaintiff, but on being applied to by him refused to do so, although they afterwards received the amount of these bills; it was held, that an action for money had and received would not lie to recover it from them, there being no privity between them and the plaintiff. Lord Ellenborough observed, the defendants might hold for the benefit of the remitter, until by some engagement entered into by themselves with the persons who were the objects of the remittance, they had precluded themselves from so doing; but here, so far from there being such an engagement, they repudiated it altogether. Williams v. Everett, 14 East, 582. Again, where J., an attorney, who was accustomed to receive dues for the plaintiff, went from home, leaving B., his clerk, at the office; B., in the absence of his master, received money on account of the above dues for the client, which he was authorized to do, and gave a receipt "B., for Mr. J." J. was in bad circumstances when he left home, and never returned. B. afterwards refused to pay the money to the client, and on an action for money had and received against him, it was held not to lie; for the defendant received the money as the agent of his master, and was accountable to him for it; the master, on the other hand, being answerable to the client for the money received by the clerk, there was no privity of contract between the present plaintiff and the defendant: Stevens v. Badcock, 3 Barn. & Adolph. 354. So in the case of Sims et al. v. Brittain et al., 4 Barn. & Adolph. 375. A., B., and others, were part-owners of a ship in the service of the East India Company; B. was managing owner, and employed C. as his-agent, and C. kept a separate account on his books with B. as such managing owner. In order to obtain payment of a sum of money from the East India Company on account of the ship, it was necessary that the receipt should be signed by one or more of the owners besides the managing owner; and upon a receipt being signed by B. and by another of the owners, C. received £2000 on account of the ship, and placed it to the credit of B. in his books as managing owner; the part owners having brought money had and received to recover the balance of that account, held, that C. had received the money as the agent of B., and was accountable to him for it; and that there was no privity between the other part-owners and C., and consequently, that the action was not maintainable. To the same effect are the cases of Rogers v. Kelly, 2 Camp. 123, and Edden v. Stead 3 Camp. 339, and Wedlake v. Husley, 1 Crompton & Jarvis, 83. If indeed the defendant has consented (where he can properly *249 consent) to hold the money for the use of the plaintiff, he may be liable. And it is conceded, that his consent need not be express, but it must, if not so, rest upon fair and natural implication or legal intendment. Where such implication or intendment is excluded, forbidden by the position of the parties, by positive law, or by the character of the transaction, consent or any obligation upon which to imply it is entirely removed.
We have thus stated, and will here recapitulate, the principles on which the action for money had and received may be maintained. They are these: 1st. Whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged, by the ties of natural justice and equity, to refund. 2dly. In the case of an agent, where such agent is not notoriously the mere carrier or instrument for transferring the fund, but has the power of retaining, and before he has paid over has received notice of the plaintiff's claim, and a warning not to part with the fund. 3dly. Where there exists a privity between the plaintiff and the defendant. Let the case before us be brought to the test of these rules. The 2d section of the act of Congress declares, first, that from its passage, all money paid to any collector of the customs for unascertained duties, or duties paid under protest against the rate or amount of duties charged, shall be placed to the credit of the treasurer, to be kept and applied as all other money paid for duties required by law. Secondly, that they shall not be held by the collector to await any ascertainment of duties, or the result of any litigation concerning the rate or amount of duty legally chargeable or collectable. And thirdly, that in all cases of dispute as to the rate of duties, application shall be made to the secretary of the Treasury, who shall direct the repayment of any money improperly charged. This section, as a part of the public law, must be taken as notice to all revenue officers, and to all importers and others dealing with those officers in the line of their duty. There is nothing obscure or equivocal in this law; it declares to every one subject to the payment of duties, the disposition which shall be made of all payments in future to collectors; tells them those officers shall have no discretion over money received by them, and especially that they shall never retain it to await the result of any contest concerning the right to it; and that quoad this money the statute has converted those officers into mere instruments for its transfer to the Treasury. With full knowledge thus imparted by the law, can it be correctly understood that the party making payment can, ex equo et bono, recover against the officer for acting in literal conformity with the law, converting thereby the performance of his duty into an offence; or that upon principles of equity and good conscience, an obligation and a promise to refund shall be implied against the express mandate of the law? Such a presumption appears to us to be subversive of every rule of right. The more correct inference seems to be, that payment under such circumstances *250 must, ex equo et bono, nay, ex necessitate, and in despite of objection made at the time, be taken as being made in conformity with the mandate of the law and the duty of the officer, which exclude not only any implied promise of repayment by the officer, but would render void an express promise by him, founded upon a violation both of the law and of his duty. The claimant had his option to refuse payment; the detention of the goods for the adjustment of duties, being an incident of probable occurrence, to avoid this it could not be permitted to effect the abrogation of a public law, or a system of public policy essentially connected with the general action of the government. The claimant, moreover, was not without other modes of redress, had he chosen to adopt them. He might have asserted his right to the possession of the goods, or his exemption from the duties demanded, either by replevin, or in an action of detinue, or perhaps by an action of trover, upon his tendering the amount of duties admitted by him to be legally due. The legitimate inquiry before this court is not whether all right of action has been taken away from the party, and the court responds to no such inquiry. The question presented for decision, and the only question decided, is whether, under the notice given by the statute of 1839, payments made in despite of that notice, though with a protest against their supposed illegality, can constitute a ground for that implied obligation to refund, and for that promise inferred by the law from such obligation, which are inseparable from, and indeed are the only foundation of, a right of recovery in this particular form of action. And here is presented the answer to the assertion, that by the act of 1839, or by the construction given to it by this court, the party is debarred all access to the courts of justice, and left entirely at the mercy of an executive officer. Neither have Congress nor this court furnished the slightest ground for the above assertion.
But the objection to a recovery in this action may be farther extended, upon grounds which to the court appear to be insuperable. We all know that this action for money had and received is founded upon what the law terms an implied promise to pay what in good conscience the defendant is bound to pay to the plaintiff. It being in such case the duty of the defendant to pay, the law imputes to him a promise to pay. This promise is always charged in the declaration, and must be so charged in order to maintain the action. It was upon this principle that the action for money had and received was sustained in the case of Elliott v. Swartwout. There money had been taken by the collector for duties which were not imposed. This money lawfully belonged to the plaintiff; it was the duty, therefore, of the collector to pay it back to him. The collector was not bound to pay it to the treasurer, for the law did not command this disposition of it. It did not belong to the United States, who had no right, therefore, to demand it of him, and could not have recovered it against him, in a suit, if he had paid it back to the true *251 owner. It being the duty of the collector to return what he had unlawfully taken, the law implied on his part a promise to do so; and on this implied promise, arising or inferred from a duty imposed upon him, the action was maintained. The protest and notice were to him of no farther importance than to warn him to hold over, and to take away an excuse he might otherwise have had from payment to his principal. It was his duty, as the law then stood, not to pay over, but to pay back to the party from whom he had collected without legal authority, when warned that this party should look to him for reimbursement, and not to his principal. But the law never implies a promise to pay, unless duty creates the obligation to pay; and more especially it never implies a promise to do an act contrary to duty or contrary to law. Now, under the statute of 1839, if the collector receives money, though for duties not due, it is nevertheless made his duty to pay it into the Treasury, to be repaid there, if the party claiming is found to be entitled to it. And the question here is, will the law imply a promise from the collector to do that which is contrary to his official duty, contrary to the command of a positive statute? If it will not, then the action of assumpsit for money had and received will not lie in this case.
Moreover, the law will never imply a promise where it would be unjust to the party to whom it would be imputed, and contrary to equity so to imply it. Suppose the collector should not, as directed by law, pay the money into the Treasury, the United States might undoubtedly maintain an action against him for money had and received to their use. Because it being his duty to do so, the law would imply a promise to pay it. Can the law at the same time imply a promise to pay it elsewhere or to another, and thus burden the collector with the double obligation of paying to the government, and also to one claiming in adversary interest? If suits were instituted against him by both parties, and were standing for trial at the same time, would both be entitled to a recovery, and would the law imply promises to both, promises to pay double the amount received? We think not; and as the law in positive terms directs payment to be made into the Treasury, there can be no judicial implication contrary to law, nor that the collector will pay to another what the law directs him to pay to the United States; and no judicial implication which would require him to be guilty of an act of official misconduct, or a breach of his duty to the public. If the law implies a promise to pay back to the party, then it must be the duty of the collector to do so as soon as it is demanded. If the money may be recovered of him by suit, then he would be justified in paying without suit, yet if he does so pay, he not only violates a duty imposed by law, but may be compelled to pay over again to the government, as for so much money had and received to its use. We think the law can never imply a promise which must be unjust and oppressive in its results to the party, or contrary to his duty as *252 a public officer; and there being no implied promise, therefore in this case the action for money had and received cannot be maintained. It is perfectly clear to the court that, under the act of 1839, the United States have, by express law, a right to demand the money from the collector, and to recover it in an action for money had and received, even if that officer had paid it over to the person from whom he had received it; and we say with confidence that in the multitude of cases that have been decided in relation to that action, there is not one in which it has been held that money could be recovered from a defendant when his voluntary payment of it would leave him still liable to an action for the same money by another.
We deem it unnecessary to examine farther the grounds stated in the second and third heads of inquiry, as forming the foundation of the action for money had and received; or to bring to a particular comparison with those grounds the law and the facts of this case, as presented upon the record. The illustrations given under the first head embrace all that is important under the remaining divisions, with respect to the nature of the demand and the position of the parties. Those illustrations establish, in the view of the court, that, so far is the defendant from being obliged, by the ties of natural equity and justice, to refund to the plaintiff the money received for duties, that, on the contrary, under that notice of the law which all must be presumed to possess, the payment must be understood as having been made with knowledge of the parties that the right of retaining or of refunding the money did not exist in the defendant; that the money by law must pass from him immediately upon its receipt; that payment to him was in legal effect payment into the Treasury; that notice to him was, under such circumstances, of no effect to bind him to refund; that as the collector, since the statute, had power neither to retain nor refund, there could, as between him and the plaintiff, arise no privity nor implication, on which to found the promise raised by the law, only where an obligation to undertake or promise exists; and that, therefore, the action for money had and received could not, in this case, be maintained, but was barred by the act of Congress of 1839.
Mr. Justice STORY.
I regret exceedingly being compelled by a sense of duty to express openly my dissent from the opinion of the majority of the court in this case. On ordinary occasions my habit is to submit in silence to the judgment of the court where I happen to entertain an opinion different from that of my brethren. But the present case involves, in my judgment, doctrines and consequences which, with the utmost deference and respect for those who think otherwise, I cannot but deem most deeply affecting the rights of all our citizens, and calculated to supersede the great guards of those rights intended to be secured by the Constitution through the instrumentality of the *253 judicial power, state or national. The question, stripped of all formalities, is neither more nor less than this: Whether Congress have a right to take from the citizens all right of action in any court to recover back money claimed illegally, and extorted by compulsion, by its officers under colour of law, but without any legal authority, and thus to deny them all remedy for an admitted wrong, and to clothe the secretary of the Treasury with the sole and exclusive authority to withhold or restore that money according to his own notions of justice or right? If Congress may do so in the present case, in the exercise of its power to levy and collect taxes and duties, and thus take away from all courts, state and national, all right to interpret the laws for levying and collecting taxes and duties, and to confide such interpretation to one of its own executive functionaries, whose judgment is to be at once summary and final, then I must say, that it seems to me to be not what I had hitherto supposed it to be: a government where the three great departments, legislative, executive, and judicial, had independent duties to perform each in its own sphere; but the judicial power, designed by the Constitution to be the final and appellate jurisdiction to interpret our laws, is superseded in its most vital and important functions. I know of no power, indeed, of which a free people ought to be more jealous, than of that of levying taxes and duties; and yet if it is to rest with a mere executive functionary of the government absolutely and finally to decide what taxes and duties are leviable under a particular act, without any power of appeal to any judicial tribunal, it seems to me that we have no security whatsoever for the rights of the citizens. And if Congress possess a constitutional authority to vest such summary and final power of interpretation in an executive functionary, I know no other subject within the reach of legislation which may not be exclusively confided in the same way to an executive functionary; nay, to the executive himself. Can it be true that the American people ever contemplated such a state of things as justifiable or practicable under our Constitution? I cannot bring my mind to believe it; and, therefore, I repeat it, with the most sincere respect for my brethren, who entertain a different opinion, I deny the constitutional authority of Congress to delegate such functions to any executive officer, or to take away all right of action for an admitted wrong and illegal exercise of power in the levy of money from the injured citizens. I am further of opinion, as I shall endeavour presently to show, that Congress never had contemplated passing any such act, and that the act of the 3d of March, 1839, chap. 82 § 2, neither requires nor in my humble judgment justifies such an interpretation.
What is the real question presented, upon the division of opinion in the Circuit Court, for the consideration of this court? It is not whether an action to recover back the money illegally claimed and paid to the collector for duties, in order to obtain possession of the *254 goods by the owner under a protest that they were not legally due, would lie in the Circuit Court, for no such question arises on the record, and it is incontrovertible and uncontroverted, that if any such action would lie, it would lie in the national courts as well as in the state courts. It is not whether Congress may limit, restrain, modify, or even take away the right to sue in the national courts, in cases like the present, or, indeed, in any other class of cases not constitutionally provided for, but it is simply whether the act of Congress of the 3d of March, 1839, chap. 82, § 2, is a bar to such an action in any court, state or national. If it is a good bar in one court, it is good in all courts under the provisions of that act. If Congress have a right to say, and have said, under the provisions of that act, that no officers of the customs shall be liable to any action for money extorted by him under colour of his office without authority and against law, then these provisions are equally applicable to all courts, and furnish the rule of decision for all. And Congress have an equal right to apply a like provision to all other acts of all other officers done under colour of office, and the trial by jury may, in suits at common law, be completely taken away in all such cases, and the right of final decision be exclusively vested in the executive, or in any other public functionary, at the pleasure of Congress.
Now, how stands the common law on this very subject? It is, that an action for money had and received lies in all cases to recover back money which a person pays to another in order to obtain possession of his goods from the latter, who withholds them from him upon an illegal demand, or claim, colore officii, and thus wrongfully receives and withholds the money. Such a payment is in no just sense treated in law as a voluntary payment, but it is treated as a payment made by compulsion, and extorted by the necessities of the party who pays it. Such is the doctrine of the common law as held in England, with a firm and steady hand, against all the claims of prerogative, and it is maintained in our day as the undeniable right of every Englishman, against the unjust and illegal exactions of officers of the crown. Mr. Justice Bayley laid down the general principle with great exactness in Shaw v. Woodcock, 7 Barn. and Cres. 73, 84, and said: "If a party has in his possession goods or other property belonging to another, and refuses to deliver such property to that other unless the latter pays him a sum of money which he has no right to receive, and the latter, in order to obtain possession of his property, pays that sum, the money so paid is a payment made by compulsion, and may be recovered back." In Irving v. Wilson, 4 Term R. 485, the doctrine was applied to the very case of the acts of an officer of the excise or customs. Upon that occasion Lord Kenyon emphatically said: "The revenue laws ought not to be made the means of oppressing the subject. If goods liable to a forfeiture be forfeited, the officer is to seize them for the king, but he is not permitted to abuse the duties of his station, *255 and to make it a mode of extortion." There are many other authorities leading to the same result, but it is unnecessary to cite them, since the very point that an action for money had and received lies against a collector of the customs to recover back money demanded by and paid to him, colore officii, upon goods imported, for duties not legally due thereon, has been, upon the most solemn deliberation, held by this court in the cases of Elliott v. Swartwout, 10 Peters, 137, and Bend v. Hoyt, 13 Peters, 263, 267.
It is an entire mistake of the true meaning of the rule of the common law, which is sometimes suggested in argument, that the action of assumpsit for money had and received is founded upon a voluntary, express, or implied promise, of the defendant, or that it requires privity between the parties ex contractu to support it. The rule of the common law has a much broader and deeper foundation. Wherever the law pronounces that a party is under a legal liability or duty to pay over money belonging to another, which he has no lawful right to exact or retain from him, there it forces the promise upon him in invitum to pay over the money to the party entitled to it. It is a result of the potency of the law, and is in no shape dependent upon the will or consent or voluntary promise of the wrongful possessor. The promise is only the form in which the law announces its own judgment upon the matter of right and duty and remedy; and under such circumstances any argument founded upon the form of the action, that it must arise under or in virtue of some contract, is disregarded, upon the maxim qui haret in litera, hret in cortice. Hence, it is a doctrine of the common law, (as far as my researches extend,) absolutely universal, that if a man, by fraud, or wrong, or illegality, obtains, or exacts, or retains money justly belonging to another, with notice that the latter contests the right of the former to receive, or exact, or retain it, an action for money had and received lies to recover it back; and it is no answer for the wrongdoer to say that he has paid it over to his superior; for although as between the wrongdoer and his superior, the maxim may well apply, respondeat superior, yet the injured party is not bound to seek redress in that direction; and à fortiori, &c., he is not so bound, where, as in the case of the government, the superior is not suable. That would be a mere mockery of justice. And this is the very doctrine affirmed in its full extent by this court in the cases of Elliott v. Swartwout, 10 Peters, 137, and Bend v. Hoyt, 13 Peters, 263, 267.
An action for money had and received being then the known and appropriate remedy of the common law, applied to cases of this sort, to protect the subject from illegal taxation, and duties levied by public officers, what ground is there to suppose that Congress could intend to take away so important and valuable a remedy, and leave our citizens utterly without any adequate protection? It is said, that circuitously another remedy may be found. The answer is, that if *256 Congress have taken away the direct remedy, the circuitous remedy must be equally barred. But in point of fact no other judicial remedy does exist or can be applied. If the collector is not responsible to pay back the money, nobody is. The government itself is not suable at all; and certainly there is no pretence to say that the secretary of the Treasury is suable therefor. Where then is the remedy which is supposed to exist? It is an appeal to the secretary of the Treasury for a return of the money, if in his opinion it ought to be returned, and not otherwise. No court, no jury, nay, not even the ordinary rules of evidence, are to pass between that officer and the injured claimant, to try his rights or to secure him adequate redress. Assuming that the secretary of the Treasury will always be disposed to do what he deems to be right in the exercise of his discretion, and that he possesses all the qualifications requisite to perform this duty, among the other complicated duties of his office  a presumption which I am in no manner disposed to question  still it removes not a single objection. It is, after all, a substitution of executive authority and discretion for judicial remedies. Nor should it be disguised, that upon so complicated a subject as the nature and character of articles made subject to duties, grave controversies must always exist (as they have always hitherto existed) as to the category within which particular fabrics and articles are to be classed. The line of discrimination between fabrics and articles approaching near to each other in quality, or component materials, or commercial denominations, is often very nice and difficult, and sometimes exceedingly obscure. It is the very case, therefore, which is fit for judicial inquiry and decision, and falls within the reach of that branch of the judicial power given by the Constitution, where it is declared "that the judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States, and treaties, &c." If then the judicial power is to extend to all cases arising under the laws of the United States, upon what ground are we to say that cases of this sort, which are eminently "cases arising under the laws," and of a judicial nature, are to be excluded from judicial cognisance, and lodged with an executive functionary?
Besides, we all know that, in all revenue cases, it is the constant practice of the secretary of the Treasury to give written instructions to the various collectors of the customs as to what duties are to be collected under particular revenue laws, and what, in his judgment, is the proper interpretation of those laws. I will venture to assert that, in nineteen cases out of twenty of doubtful interpretation of any such laws, the collector never acts without the express instructions of the secretary of the Treasury. So that in most, if not in all cases where a controversy arises, the secretary of the Treasury has already pronounced his own judgment. Of what use then, practically speaking, is the appeal to him, since he has already given his decision? Further, it is well known, and the annals of *257 this court as well as those of the other courts of the United States establish in the fullest manner, that the interpretations so given by the secretary of the Treasury have, in many instances, differed widely from those of the courts. The Constitution looks to the courts as the final interpreters of the laws. Yet the opinion maintained by my brethren does, in effect, vest such interpretation exclusively in that officer.
These considerations have led me to the conclusion that it never could be the intention of Congress to pass any statute, by which the courts of the United States, as well as the state courts, should be excluded from all judicial power in the interpretation of the revenue laws, and that it should be exclusively confided to an executive functionary finally to interpret and execute them  a power which must press severely upon the citizens, however discreetly exercised, and which deeply involves their constitutional rights, privileges, and liberties. The same considerations force me, in all cases of doubtful or ambiguous language admitting of different interpretations, to cling to that which should least trench upon those rights, privileges, and liberties, and à fortiori to adopt that which would be in general harmony with our whole system of government.
And this leads me to say that, after the most careful examination of the 2d section of the act of 1839, chap. 82, I have not been able to find any ground to presume that Congress ever contemplated any thing contained in that section to be a bar to the present action. I look upon that section as framed for a very different object, an object founded in sound policy and to secure the public interest. It was to prevent officers of the customs from retaining (as the habit of some had been) large sums of money in their hands received for duties, upon the pretence that they had been paid under protest, and thus to secure in the hands of the officers a sufficient indemnity for all present as well as future liabilities to the persons who had paid them. By this means large sums of money were withheld from the government, and there was imminent danger that severe losses might thus be sustained from the defalcation of those officers, and the public revenue might be thus appropriated to the personal business or speculating concerns of the officers. If actions should be brought and judgment obtained against such officers for the repayment of any of such duties, it was plain that the government would be bound to indemnify them, especially if they had acted under instructions from the Treasury Department. On the other hand, the government, being in possession of the money, would hold it in the mean time as a deposit to await events, and to refund the same if in the due administration of the law it was adjudged that it ought to be refunded. Such, in my judgment, was the object and the sole object of the section, and it seems to me in this view to be founded in a wise protective policy.
*258 With this exposition in our view, let us examine the language of the section. It is as follows: "That from and after the passage of this act, all money paid to any collector of the customs or to any person acting as such, for unascertained duties or for duties paid under protest against the rate or amount of duties charged, shall be placed to the credit of the treasurer of the United States, kept and disposed of as all other money paid for duties is required by law or by regulation of the Treasury Department to be placed to the credit of said treasurer, kept and disposed of; and shall not be held by the said collector or person acting as such to await any ascertainment of duty, or the result of any litigation in relation to the rate or amount of duty legally chargeable and collectable in any case where money is so paid." Now, pausing here, it seems to me that the clause is plainly and merely directory to the collector or person acting as such, pointing out his duty and requiring him to pass the money so paid to the credit of the government as soon as it is received. Nothing is here said as to the rights of third persons, who pay the money for duties; no declaration is made that the collector shall not be liable to any action for such duties, if not legally demandable or payable, or that the collector or such other person shall not be liable to refund the same. And yet, if such had been the intention of Congress, it seems to me incredible that a provision to this effect should not have been found in the act. But further; not only is there a total absence of any such provision, but there is positive evidence that Congress contemplated that there would be suits brought against the collectors and other persons for the repayment of such duties, and, accordingly, as we see, the money is not to be retained by them "to await any ascertainment of duties or the result of any litigation." The language is not limited to the result of past or pending litigation, but it equally applies to future litigation; in short, any litigation, without any limitation as to time, and indeed to be coextensive with the permanent prospective operation of the act. If, then, there is in this clause no positive or implied bar to any action provided for, and if the clause is perfectly satisfied by deeming it to be what it professes on its face to be, a regulation addressed to the collectors and other persons collecting duties, and directory to them, let us see if the subsequent clause, which contains the residue of the section, either enlarges, or qualifies, or repels the inferences drawn from the preceding clause. This clause is, "But whenever it shall be shown to the satisfaction of the secretary of the Treasury, that, in any case of unascertained duty or duties paid under protest, more money has been paid to the collector or other person acting as such, than the law requires should have been paid, it shall be his duty to draw his warrant upon the treasurer in favour of the person or persons entitled to the over-payment, directing the said treasurer to refund the same out of any money in the Treasury not otherwise appropriated."
*259 This is the whole of the clause, and, unless I am greatly deceived in its purport and effect, not one word is to be found therein which bars the party who has paid the money from his right of action against the collector or other persons acting as such to recover back the money illegally claimed, or which compels such party to make his application or appeal solely to the secretary of the Treasury for redress, or gives to the latter exclusive power, jurisdiction, and final arbitrament in the premises. The true object of this clause seems to be precisely what its language imports, to give the secretary of the Treasury a power which he did not previously possess, to draw from the Treasury money which had been overpaid for duties when he was satisfied of such over-payment, upon the application of the party interested. It was not to be compulsive on the party, that he should so apply, but he had an option to apply to the secretary, to save the delay and expense of a protracted litigation, if the secretary should grant him the desired relief. It would also diminish the necessity of applications to Congress for the repayment of money which had been illegally paid for duties, by enabling the secretary to draw his warrant upon the Treasury for the amount; which relief, when the money had been paid into the Treasury, could not before be obtained except by means of an act of Congress. It was, therefore, an auxiliary provision to the general rights of action secured to the party by the common law, and not in extinguishment or suspension of it. Whether the clause clothed the secretary also with authority to draw a warrant in favour of the party, if he recovered back the money in a suit at law against the collector, is a matter which might, upon the strict words of the clause, admit of some doubt, since the case provided for is only where the over-payment shall be shown to the satisfaction of the secretary, and not where it is a result of a judgment at law. But a liberal construction might embrace such a case also, as within the intent, if not strictly within the words. But be this as it may, it is manifest to my mind, with all deference to the judgment of others, that the affirmative power thus given by this clause to the secretary, cannot be construed to exclude the right of the party to his remedy at the common law without a violation of the known rules of interpretation, by adding important and material language which the legislature has not used, and incorporating provisions which neither the words nor the professed objects of the section require.
Nor am I able to perceive any grounds upon which a different interpretation can be maintained, unless it be, that it would be a hardship upon the collector to require him to pay money over to the government which he might be compelled again to pay to the party from whom he had illegally demanded it. One answer to this suggestion is, that he cannot complain, because it is his own choice to hold an office to which such a duty or responsibility is attached, and if he elects to hold it, he ought to take it cum onere. *260 Another and conclusive answer is, that he has a perfect right of indemnity from the government; nor can it be doubted that the government will always indemnify all its officers for acts done by its orders and demands made under its authority. On the other hand, an extreme hardship would be thrown upon the injured party, whose money is taken from him against his will by colour of office, and against his right, if his common law remedy is swept away; for then he can have no means of redress, and no indemnity, since he has resisted the demands of the government and asserts an adversary interest.
Nor is it any ground of excuse, (as has been already suggested,) in case of money paid by compulsion, that the officer has paid over the money to his principal; and in this respect it differs from the case of a voluntary payment. This distinction was taken and acted upon in the case of Snowden v. Davis, 1 Taunt. R. 358, where money had been paid to a bailiff under a threat of a distress by an excess of authority, and the money had been paid over by him to the sheriff, and by the latter into the exchequer. And the same doctrine was fully recognised and confirmed by this court upon the most solemn consideration in Elliott v. Swartwout, 10 Peters, 137, after a full review of all the leading authorities.
Upon the whole my opinion is, that the question propounded by the Circuit Court upon the division of opinion of the judges in that court, ought to be answered in the negative, that the 2d section of the act of 3d of March, 1839, chap. 82, was no bar to the action.
Mr. Justice McLEAN.
This suit was brought to recover from the defendant, collector of the customs, an excess of duties exacted by him of the plaintiffs against law. And on the trial in the Circuit Court the judges were divided on the question, "whether the act of the 3d of March, 1839, was a bar to the action." This point has been certified to this court.
The 2d section of the above act provides, "that from and after, the passage of this act, all money paid to any collector of the customs, or to any person acting as such, for unascertained duties, or for duties paid under protest against the rate or amount of duties charged, shall be placed to the credit of the treasurer of the United States, kept and disposed of as all other money paid for duties is required by law or by regulation of the Treasury Department to be placed to the credit of the said treasurer, kept and disposed of; and shall not be held by the said collector, or person acting as such, to await any ascertainment of duties or the result of any litigation in relation to the rate or amount of duty legally chargeable and collectable in any case where money is so paid; but whenever it shall be shown to the satisfaction of the secretary of the Treasury, that, in any case of unascertained duties or duties paid under protest, more *261 money has been paid to the collector or person acting as such than the law requires should have been paid, it shall be his duty to draw his warrant upon the treasurer in favour of the person or persons entitled to the over-payment, directing the said treasurer to refund the same out of any money in the Treasury not otherwise appropriated."
In the case of Elliott v. Swartwout, 10 Peters, 137, and in Bend v. Hoyt, 13 Peters, 263, this court held, that illegal duties exacted by the collector were recoverable from him, where paid under protest, by the importer, in an action of assumpsit. This doctrine is not questioned in this country or in England. Has the 2d section of the act above cited changed the law in this respect? A majority of the judges have decided in the affirmative, and that that act constitutes a bar to an action in such a case. I dissent from the opinion of the court.
The above section, in my judgment, so far from taking away the legal remedy, expressly recognises it. The collector is required, "from and after the passage of the act," to pay over to the treasurer the moneys in his hands, and not "to await any ascertainment of duties, or the result of any litigation in relation to the rate or amount of duty legally chargeable," &c. Now, if Congress intended by this section to withdraw this subject from the courts, and vest the exclusive right to decide the matter in the secretary of the Treasury, could they have used this language? The law was not to operate upon the past, but upon the future acts of the collector. And I ask in sober earnestness, whether the collector could be required to pay over money, "and not await the result of a litigation," as "to the amount of duties legally chargeable," if the intention was to prohibit such litigation. I use the words of the section; and the words of the section alone, as I think, are conclusive as to the intention of Congress. The collector must pay over the money, and not retain it until the termination of a suit. Does this take away the right to bring a suit? Such an inference, it seems to me, would be as exceptionable in logic as in law.
From the proceedings of this court we know that collectors of the customs after their removal from office or the expiration of their term, and sometimes while in office, under the pretext of indemnifying themselves against suits for the exaction of illegal duties, were in the practice of withholding from the Treasury large sums of money. And it was to remedy this evil, that the above law was passed. As to the remission of duties illegally charged, it vested in the secretary no new powers; but it authorizes him, where the excess of duty has been paid into the Treasury, to draw it out by a warrant, and pay it over to the person entitled to receive it. By the 21st section of the Duty Act of 1799, (1 Story, 592,) the collectors "were required, at all times, to pay to the order of the proper officer the whole of the moneys which they may respectively receive, &c., and shall once in three months, or oftener if required, transmit their accounts," *262 &c. Now, it is known from public documents and from cases before this court, that the secretary of the Treasury has, for a long time before the act of 1839, required the collector of New York to pay over moneys received by him, weekly or at short intervals. And can it be pretended that the act of 1799, under the instructions of the secretary of the Treasury, was not as binding upon collectors as the act of 1839? In a legal point of view the liability of a collector was the same for illegal duties received by him, whether paid into the Treasury under the one law or the other.
It is said that the law cannot raise a promise to pay by an officer, where it requires him to pay the same money into the Treasury. The action is founded on the illegality of the transaction. None other than legal duties are payable to the government; and where an officer by his own volition, or acting under the instructions of his superior, demands a higher duty than the law authorizes, he is guilty of a wrong which his instructions cannot justify. And having done this, can it be contended, that by paying over moneys so obtained he can escape the legal consequence of his unlawful act? Where one person obtains money illegally from another, is he not bound in conscience to return it? And may not an action of assumpsit be sustained for the recovery of the money? In such an action the question is, whether the defendant has received money which he is bound in good conscience to pay to the plaintiff. Now, if the defendant, as collector, exacted a higher duty of the plaintiffs than the law authorized, is he not bound in conscience to return the excess? But it is said that he has paid it over to the Treasury of the United States, in pursuance of the act of 1839, and that this is a bar to the action. Why has not this bar been set up under the act of 1799? By that act the collector, when ordered by the secretary of the Treasury, was as much bound to pay over the money in his hands into the Treasury as under the act of 1839. And yet for forty-four years such a defence has not been thought of. It has never been supposed that the payment of the money into the Treasury exonerated the collector. He has violated the law, and he is answerable for that violation. This must be the case, unless, in the language of this court in the case of Elliott v. Swartwout above cited, "the broad proposition can be maintained, that no action will lie against a collector to recover back an excess of duties paid him, but that recourse must be had to the government for redress. Such a principle," the court say, "would be carrying an exemption to a public officer beyond any protection sanctioned by any principles of law or sound public policy."
In Townson v. Wilson et al., 1 Camp. 396, Lord Ellenborough says, "If any person gets money into his hands illegally, he cannot discharge himself by paying it over to another." The same doctrine is held in Sadler v. Evans, 4 Burr. 1986. And this court in the above case of Elliott v. Swartwout say, "It may be assumed as the *263 settled doctrine of the law, that where money is illegally demanded and received by an agent, he cannot exonerate himself from responsibility by paying it over to his principal, if he has had notice not to pay it over. A notice not to pay over the money to the principal, it is contended, presupposes a right in the agent to retain it. No such inference could arise under the act of 1799, nor can it be made under the present law. The notice should induce the collector to reconsider his act, and if found to have been against law to correct it. But it is said, he may have acted under the orders of the secretary of the Treasury. Suppose he did, would that justify or excuse an illegal act? I will answer this in the language of this court in the case last cited: "Any instructions from the Treasury Department could not change the law or affect the rights of the plaintiff. He, the collector, was not bound to take and adopt that instruction. He was at liberty to judge for himself, and act accordingly." And in Tracy v. Swartwout, 10 Peters, 99, this court say, "that the personal inconvenience of the collector is not to be considered." When acting under instructions the government is bound to indemnify him. In my judgment the act of 1839 interposes no bar to this action.
But there is another aspect in which this case must be considered. Feeling, as I do, an unfeigned respect for the opinion of the judges who differ from me, yet I cannot, without concern, look at the consequences of the principle established in this case. The right of a citizen to resort to the judicial tribunals of the country, federal or state, for redress for an injury done by a public officer, is taken away by the construction of an act of Congress, which, in my judgment, bears no such construction. But I will take higher ground, and say, that Congress have no constitutional power to pass such an act as the statute of 1839 is construed to be by this decision.
By the 2d section of the 3d article of the Constitution of the United States, the judicial power extends to all cases in law and equity arising under the Constitution and laws of the union. And by the 7th section of the amendments to the Constitution it is provided, that "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."
The act of 1839, in my judgment, does not conflict with either of the above constitutional provisions. But if it take away the right of the citizen to sue in a court of law for the injury complained of, as construed by my brethren, then it is in direct conflict with both of the above provisions.
In a matter of private right it takes from the judiciary the power of construing the law, and vests it in the secretary of the Treasury; the executive officer under whose sanction or instruction the wrong complained of was done.
*264 And in the second place it takes from the citizen the right of trial by jury, which is expressly given to him by the Constitution.
I again repeat that Congress have not done this, nor did they intend to do it by the act of 1839. But the act is so construed by the decision just pronounced. Under this view, I feel myself bound to consider the principle established by the court, and to speak of its consequences.
That the act, as construed, is in direct conflict with the above provisions of the Constitution, is so palpable that it seems to me no illustration could make it clearer.
The right to construe the laws in all matters of controversy, is of the very essence of judicial power. Executive officers who are required to act under the laws, of necessity, must give a construction to them. But their construction is not final. When it operates injuriously to the citizen, he may, by any and every possible means through which it may be brought before the courts, have the construction of the law submitted to them, and their decision is final.
But the court say, that the plaintiffs in this case cannot seek redress for the injury complained of, by an action at law, but, under the act of 1839, are referred to the secretary of the Treasury; an executive officer, who has prejudged the case, who can exercise neither the forms nor the functions of a judicial officer; who acts summarily, without a jury, and from whose judgment there is no appeal. The case turns upon facts; facts properly triable by a jury. The question is, whether the articles on which the duties have been assessed, are such articles as under the law are liable to be thus taxed. This is a question most fit to be answered by a jury of merchants, under the instructions of a court of law. The plaintiffs allege that the duty was not authorized by law, but to obtain possession of their goods, they were compelled to pay it, protesting against the right of the government. And they brought an action at law to recover from the collector the excess of duty paid. This course had been sanctioned by previous decisions. It was, in fact, the only effectual course they could take to obtain possession of their goods. A tender of the legal duty, and a replevin, if it would lie, involved the necessity of security for a return of the goods which, if in the power of the importers, might not have been convenient to them. But a replevin is expressly prohibited in such a case by the act of 2d March, 1833.
The question arises on the facts stated. Illegal duties were demanded by the collector and paid to him by the plaintiffs, before they could obtain their goods; and the question is, has their remedy at law been cut off by the statute of 1839? This is a taxing power; the most delicate power that is exercised by the government. It reaches the concerns of the citizen, and takes from him a part of his property for purposes of revenue. The tax should be judicious, and the mode of collecting it should be specially guarded. Care *265 should be taken not to infringe private right in making this public exaction. But, especially, where, in this respect, a wrong has been done to the citizen, the courts should be open to him. His remedy should be without obstruction. But my brethren say that the act of 1839 takes away from the plaintiffs all remedy except an appeal to the secretary. The state courts as well as the federal are closed against the injured party.
The able men who laid the foundations of this government saw that, to secure the great objects they had in view, the executive, legislative, and judicial powers, must occupy distinct and independent spheres of action. That the union of these in one individual or body of men constitutes a despotism. And every approximation to this union partakes of this character.
What though no positive injustice be done to the plaintiffs in this case; is that any reason why the great principle involved in it should be yielded? What is this principle? It is nothing less than this; that throughout the whole course of executive action, summary, diversified, and multiform as it is, for wrongs done the citizen, all legal redress may be withdrawn from him; and he may be turned over as a petitioner to the power that did the wrong. If this may be done in the case under consideration, it may, on the same principle, be done in every similar case.
A seizure of a vessel and cargo may be made by an officer under a supposed breach of the revenue law, and the question of forfeiture may be referred to the secretary of the Treasury. Private property may be taken for public purposes, and the owner may be limited to the remedy, if remedy it may be called, of petitioning some executive officer for remuneration. Military violence may be perpetrated on the person of a citizen or on his property, and his relief may be made to depend on the will of the commander-in-chief. In short, in every line of the executive power, wrongs may be done and legal redress may be denied.
The cases put may seem to be extreme ones, and therefore not likely to happen. But do they not test the principle? I think they do. If Congress may deprive these plaintiffs of their remedy by action at law, they may do the same thing in the cases specified. Indeed, it would be difficult to prescribe any limit to legislative action on this subject. It can, at least, be extended through all the ramifications of executive power.
To say that this will never be done, and that the consequences spoken of can never happen, is no answer to the argument. Do the consequences lie within the exercise of the principle? If they do, the consequences must follow a general exercise of the power. The danger is in sanctioning the principle. At this point, I meet the principle and combat it. I object to it because it is dangerous and may be ruinous. It takes from the citizen his rights  rights secured to him by the Constitution; the trial by jury, in a court of *266 law. This is done by the act of 1839, if it be what it is now construed to be. In this aspect, then, I say, the act is unconstitutional and void. It not only strikes down the rights of the citizen, but it inflicts a blow on the judicial power of the country. It unites, in the same department, the executive and judicial power. And on a subject the most delicate and interesting; and one which, of all others, may most easily be converted into an engine of oppression.
In this government, balances and checks have been carefully adjusted, with a view to secure public and private rights; and any departure from this organization endangers all. We have less to apprehend from a bold and open usurpation by one department of the government, of powers which belong to another, than by a more gradual and insidious course. In my judgment, no principle can be more dangerous than the one mentioned in this case. It covers from legal responsibility executive officers. In the performance of their ministerial duties, however they may disregard and trample upon the rights of the citizen, he can claim no indemnity by an action at law. This doctrine has no standing in England. No ministerial officer in that country is sheltered from legal responsibility. Shall we in this country be less jealous of private rights and of the exercise of power? Is it not our boast that the law is paramount, and that all are subject to it, from the highest officer of the country to its humblest citizen? But can this be the case if any or every executive officer is clothed with the immunities of the sovereignty? If he cannot be sued, what may he not do with impunity. I am sure that my brethren are as sincere as I am, in their convictions of what the law is, in this case; and I have only to regret, that their views do not coincide with those I have stated.